686 A.2d 274

James Edward **PERRY,**

v.

**STATE of Maryland.**

**No. 119, Sept. Term, 1995.**

Court of Appeals of Maryland.

Dec. 16, 1996.

208

Nancy S. Forster, Assistant Public Defender (Stephen E. Harris, Public Defender; Claudia A. Cortese, Assistant Public Defender, on brief), Baltimore, for Appellant.

Ann N. Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Appellee.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

This is a direct appeal from three sentences of death and a life sentence for conspiracy to commit murder. Pursuant to an agreement or contract with one Lawrence Horn (Horn), the

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

appellant, James Edward Perry (Perry), murdered Horn's former wife, the Horns' disabled son, and the son's nurse. As explained below, we shall affirm the judgments of conviction, but this affirmance is without prejudice to Perry's raising on post conviction review the asserted error discussed in Part II, *infra*, involving the claimed inadmissibility of a recorded telephone conversation.

Horn's ex-wife, Mildred Horn, his son, a severely handicapped eight year old, Trevor Horn, and Trevor's nurse, Janice Saunders, were murdered during the early morning hours of March 3, 1993, in Mildred Horn's home in Rockville, Maryland. Horn arranged for the murders because, upon the deaths of Mildred and Trevor Horn, over $1 million, tax free, would be distributed to him from a trust for the benefit of his son.

On this appeal Perry does not challenge the sufficiency of the evidence to sustain the guilty verdicts. The State proved that Horn, who lived in Los Angeles, became acquainted with Perry, who lived in Detroit, through Horn's cousin, Thomas Turner. Much of the State's case was developed through telephone calls between Perry and Horn who frequently communicated with one another by using a telephone credit card issued in a false name to Horn's cousin, Marcia Webb, who had obtained the card for Horn at his request.

To augment the foregoing outline we set forth below from the State's brief the statement of facts to which Perry took no exception in his reply.

"Shortly after midnight on March 3, 1993, a man identifying himself as James Perry registered at the Days Inn at 16001 Shady Grove Road in Rockville, Maryland. The man listed his address as being 13403 Glenfield and the tag number of his car as being EGR 643. Because he paid by cash, the man was required to provide identification; he produced a Michigan driver's license. During closing argument, defense counsel acknowledged that the driver's license presented was Perry's—that it had his picture on it.

"Prior to December of 1993, Appellant Perry lived at 13403 Glenfield in Detroit, Michigan, and one of the telephone numbers at that address was 313-372-7434. As of March of 1993, Michigan license tag number EGR 643 was registered to Betty Jo Riggs of Lansing, Michigan, who had no knowledge of James Perry.

"At 2:00 a.m. on March 3, 1993, Janice Saunders made various notations about Trevor Horn's condition in connection with her duties as Trevor's nurse. Trevor Horn, who was eight years old at the time, was under 24-hour nursing care due to injuries suffered at Children's Hospital when he was much younger.

"Trevor, who had not been expected to survive after what was referred to at trial as 'the accident' at Children's Hospital, had 'turned everything around' after being sent home. Although he was unable to walk, Trevor could crawl on his stomach and lift lightweight items. Although he suffered from cerebral palsy and extensive brain damage, Trevor enjoyed playing certain games, interacted with other students at school, and was able to say some words. Trevor, who had a tracheostomy, breathed primarily through a trach tube, and he received oxygen and humidification via tubing that ran from machines to a collar that fitted loosely around his neck. Trevor used a portable oxygen system when he went to school. Trevor's ability to make noises and words indicated that air was passing beyond his trach tube.

"At approximately 2:30 a.m. on March 3, 1993, Tiffany Horn, Trevor's older sister, spoke to her mother, Mildred Horn, by telephone from her dorm room at college, after mistakenly dialing her mother while attempting to contact her boyfriend. Just the night before, after 10:30 p.m. on March 1, Tiffany Horn had spoken to her father, Lawrence Horn, who lived in Los Angeles, California. During that conversation, Lawrence Horn had asked constant questions about when Mildred and Tamielle [Trevor's twin sister] would be at home. As of 2:03 a.m. (eastern standard time) on March 3, 1993, Lawrence Horn was videotaping his L.A. apartment, including the television, which was then on.

"At 5:12 a.m. on March 3, 1993, a twenty-two second call was made from a pay phone at the Denny's restaurant on Quince Orchard Boulevard in Gaithersburg, Maryland to Horn's residence in Los Angeles. The number called in L.A. was 213–874–4415, the number of Lawrence Horn's telephone—not that of his girlfriend, Shira Bogan, who had her own telephone number at the apartment she shared with Horn.

"Around 6:00 a.m. on March 3, 1993, George Murphy, who lived in a townhouse that was about five minutes walking distance and two minutes driving distance from North Gate Drive, saw a van with a handicap tag parked in a reserved parking space on Rosetree Court. The van seen by George Murphy belonged to Mildred Horn. At 6:30 a.m. on March 3, 1993, James Perry checked out of his room at the Days Inn in Rockville.

"At approximately 7:15 a.m. on March 3, 1993, Vivian Rice, as was her routine prior to going to work each morning, went to her sister Mildred Horn's house on North Gate Drive. Ms. Rice became alarmed when she saw the garage door open and heard Trevor's apnea monitor sounding. The police were alerted, and once inside they discovered the dead bodies of Mildred Horn, Trevor Horn, and Janice Saunders. Mildred Horn had been shot three times in the head; one of those shots had gone through the eye and then through the brain. Janice Saunders had been shot twice, and she too had been shot in the eye. Trevor Horn had died of asphyxia, and the medical examiner initially believed that Trevor's death had been caused by the turning off of his medical equipment. Upon receiving more information about Trevor's health and related circumstances, the medical examiner reached a different assessment—that Trevor's air supply had been cut off by suffocation. When Trevor's body was found, there was a piece of plant material on his cheek. This circumstance was described as 'very unusual' by one of the nurses who provided care for Trevor.

"Investigation of the Horn residence once the bodies were discovered disclosed that only a few areas of the home had

been disturbed: a rug and cocktail table in the living room had been moved; cushions on a sofa in the family room had been placed on the floor; the contents of Mildred Horn's purse had been dumped on the floor of the first floor powder room; a rug in a second floor bathroom had been kicked to the side; a bookcase in Tiffany Horn's bedroom had been toppled; Mildred Horn's bedroom appeared to have been 'slightly tossed'; the screen of a basement window had been pulled away and there were pry marks on the window frame; and french doors leading out to a deck had puncture marks in their weather stripping. But for a missing Gucci watch, none of Mildred Horn's jewelry, which included a 5–carat diamond tennis bracelet lying on the counter in her bathroom, had been taken, and neither Janice Saunders' purse nor other personal possessions, including jewelry, had been disturbed. There were, however, some credit and check-cashing cards missing from Mildred Horn's wallet. Some of those cards were found by a jogger on Norbeck Road during the morning of March 3, 1993, and more were found in the same general vicinity once the jogger's discovery was reported to the police.

"At 11:50 a.m. (eastern standard time) on March 3, 1993, a one-minute call was placed from a pay phone at the U.S. Post Office on Wilcox Avenue in Los Angeles, California to the Days Inn in Rockville, Maryland. This particular call was charged to a telephone calling card issued to Kamella McKinney.

"Kamella McKinney was the false name used by Marsha Webb, Lawrence Horn's cousin, to obtain telephone service from Pacific Bell after having had service in her own name cut off due to inability to pay her bill. The calling card was issued in February of 1992, and it was first used on April 3, 1992 and last used on December 27, 1993. According to Webb, she obtained the calling card for the McKinney account because Lawrence Horn asked her to do so. Horn's reasoning was that he would be traveling back and forth to Rockville and did not want the bills coming to his home address.

"Once Webb got the McKinney calling card, she used it only a few times at the outset, and she gave the card number only to Lawrence Horn. Webb did not know anyone by the name of James Perry. State's Exhibit 682A reflects that the McKinney calling card was used to make 70 calls from Detroit to Lawrence Horn's residence; 66 calls from Los Angeles to James Perry's residence; 6 calls from phones in Los Angeles or elsewhere in California to Francel's bar in Detroit, an establishment that James Perry frequented; 13 calls from Los Angeles to Maryland while James Perry was registered at a Maryland hotel; 1 call from Maryland to James Perry's residence while Lawrence Horn was registered at a Maryland hotel; and 1 call from Maryland to Lawrence Horn's residence while James Perry was registered at a Maryland hotel. State's Exhibit 682 reflects also that the McKinney calling card was used to make a call from a pay phone at the Calverton Shopping Center in Beltsville, Maryland to Francel's bar in Detroit on July 20, 1993 at 8:57 p.m. At the time in question, Lawrence Horn was observed using the Calverton Shopping Center pay phone at issue.

"At 3:18 a.m. on March 5, 1993, there was a twenty-one minute phone call from a pay phone in Beverly Hills to James Perry's residence. Again, the McKinney calling card was used. Just a minute before, the McKinney calling card was used to make a call from the same Beverly Hills pay phone to 313–884–9715 at 5323 Lakepointe in Detroit, Michigan; 313–884–9715 had previously been assigned to a telephone at 5026 Devonshire in Detroit.

"During the spring of 1992, Thomas Turner, a first cousin of Lawrence Horn and a good friend of James Perry, lived at 5026 Devonshire in Detroit, Michigan. Also in the spring of 1992, Turner met Lawrence Horn at his cousin Jean Baker's house; it had been about 20 years since Turner had seen Horn. After the meeting at Jean Baker's, Horn visited Turner at Turner's Devonshire residence on several occasions. On one of these occasions Turner talked about James Perry to Horn and advised that Perry might be able

to assist Horn, who was then having problems respecting visitation with his children.

"Turner, who denied being involved in the murders in this case and who was granted immunity from prosecution with respect to the murders, testified at trial about a number of matters, including the following: that he had rented a car for James Perry on a number of occasions including in early December of 1992, late January of 1993, early February of 1993, and from March 1 through March 8, 1993; that in the summer/fall of 1993, Lawrence Horn had advised that things were 'a little hairy,' and he had told Turner on several occasions not to say anything if contacted by the police; that Turner had been picked up by the F.B.I. in January of 1994, at which time he had called Horn and Horn had arranged for a lawyer for Turner; that he, Turner, had facilitated telephone contacts between Horn and Perry on two or three occasions after the murders, including at Thanksgiving time in 1993.

"Unknown to Turner, his telephone was the subject of an F.B.I.-monitored wiretap between November 15, 1993 and January 10, 1994. State's Exhibit 570 is a collection of transcripts of various conversations that were intercepted between November 24, 1993 and January 6, 1994. During a telephone conversation between Lawrence Horn and Thomas Turner on November 25, 1993, arrangements were made for a contact at 4:00 p.m. (Detroit time) on November 26, 1993. On November 26, 1993, Perry went into Francel's bar at 3:59 p.m. and he left 28 minutes later. Between 4:00 and 10:15 p.m. on November 28, 1993, there was a series of calls—Horn and Turner, Perry and Turner, Horn and Turner, Perry and Turner, Perry and Turner—about a 10:00 p.m. contact. At 7:12 p.m. (California time) on November 28, 1993, a direct dial call was placed from Marsha Webb's residence to an establishment known as Mr. Money at 18287 Livernois in Detroit. Lawrence Horn was staying with Marsha Webb at the time in question, and neither she nor her boyfriend made the call at issue. Mr. Money was an establishment belonging to Dr. King, someone with whom

Perry had worked, and Thomas Turner had gone to Mr. Money with Perry on several occasions.

"A mere five days before the aforementioned series of telephone calls on November 28, Perry's home had been searched by the F.B.I. Among the items seized was a catalogue from Paladin Press. Advertised therein was a publication called *Hit Man: A Technical Manual for Independent Contractors*. Records of Paladin Press reflect that James Perry of 13403 Glenfield in Detroit, Michigan ordered the *Hit Man* publication, as well as another book entitled *How to Make Disposable Silencers*, and that he submitted a check dated January 24, 1992 to pay the cost of the two books. Although Perry's check bounced, his order was processed on January 28, 1992, and the company recognized a loss for accounting purposes on May 28, 1992.

"Among other things, the *Hit Man* manual that Perry ordered recommended the following: use an AR7 rifle because it is lightweight and easy to conceal when disassembled; drill out the AR7's serial number; while still at the crime scene, run a rat tail file down the weapon's barrel to change the gun barrel's ballistic markings; dispose of weapon parts at various different locations; if the hit is meant to appear like a burglary, mess up the scene and take concealable items of value and then dispose of them along with the weapon; if necessary to shoot from a distance, use a silencer and aim for the head, preferably the eye sockets. The *Hit Man* manual also recommended that there be up-front payment of expense money of between $500 and $5,000.

"Between August 18, 1992 and January 28, 1993, either James Perry or his girlfriend, Pauline McGhee, on Perry's behalf, received a number of Western Union money transfers from a person named George Shaw, who gave 213–877–2121 as his telephone number on one occasion and who, when specifying an address, used 6222 or 6255 Sunset Boulevard. The telephone number 213–877–2121 was that of a law firm at 10 Universal City Plaza in Universal City, Los Angeles, California; no one by the name of George Shaw had worked for the firm. Although searched for, 6222

Sunset Boulevard could not be found. The address of 6255 Sunset Boulevard did exist and had once been the address of Motown, but no one by the name of George Shaw had ever worked for Motown. The obituary for a person named George Shaw had, however, been published in the July 27, 1992 edition of the *Los Angeles Times,* as had been an announcement of the death of Motown star Mary Wells. During the summer of 1992, Shira Bogan and Lawrence Horn had discussed the fact of Mary Wells's death.

"The dates and amounts of the money transfers from George Shaw were as follows: August 18, 1992—$500; September 22, 1992—$2,500; September 30, 1992—$2,500; December 4, 1992—$300; January 28, 1993—$200. The December 4 transfer was received by James Perry on December 5, 1992 at the All American '76 Truck Plaza in Breezewood, Pennsylvania. The January 28, 1993 transfer was received by James Perry at Mailboxes, Etc. in Gaithersburg, Maryland.

"On March 26, 1993, pieces of an AR7 rifle were found along Route 28 in Montgomery County; holes had been drilled in one of the pieces in a manner consistent with the obliteration of the weapon's serial number. An F.B.I. forensic metallurgist was of the opinion that the weapon had been exposed to the surrounding environment for a matter of weeks and that the weapon had been intentionally fractured and disassembled. As early as March 3, 1993, police had found a metal file, one of the tips of which was wrapped with duct tape, on the ground near the wheelchair ramp leading to the deck of Mildred Horn's residence. Processing of the file revealed two materials found in gun propellants, and those materials were found on that portion of the file that could have been fitted in the barrel of an AR7 .22 caliber rifle. Also, bullet fragments removed from the victims were determined to be consistent with .22 caliber long rifle ammunition. An AR7 rifle 'is manufactured to accept and function properly with . . . 22 long rifle caliber ammunition.'

"On July 19, 1994, James Perry was arrested in Detroit, Michigan, after having been indicted in Maryland for the murders of Janice Saunders and Mildred and Trevor Horn. While awaiting confirmation that an indictment had been returned, Perry asked whether anyone else was going to be arrested or indicted that day. When told yes, and when Lawrence Horn from California was identified as the other person, Perry said he had never heard of Horn."

Brief of Appellee at 3–19 (record references and footnotes omitted).

Perry claims error with respect to the following points:

1. Refusal to propound a requested *voir dire* question;

2. Allowing into evidence a tape recording, found in a search of Horn's residence and containing twenty-two seconds of a telephone conversation between Perry and Horn;

3. Admitting into evidence portions of Horn's deposition taken in civil actions involving the trust corpus;

4. Permitting a state fingerprint expert to testify in rebuttal concerning "open" prints;

5. Instructing on the use of prior inconsistent statements;

6. Sufficiency of the evidence at the sentencing phase to establish the aggravating factors relied upon by the State; and

7. The constitutionality of Maryland's death penalty statute.

Additional facts will be stated to the extent required in the discussion of each of the foregoing issues.

I

■ Perry contends that the circuit court committed reversible error in circumscribing the *voir dire* examination of prospective jurors. One of the questions that the court put to the venire was:

"Has any member of the prospective jury panel or a member of your family or a close personal friend of yours

ever had a prior experience as a juror, witness, victim or defendant in any criminal homicide or aggravated assault proceeding?"

Perry submits that the question should have been expanded to embrace any criminal proceeding. Alternatively, he submits that "any crime of violence" should have been substituted for "aggravated assault."

The scope of *voir dire* and the form of the questions propounded rest firmly within the discretion of the trial judge. *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33, 35 (1996); *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867, 870–71 (1993); *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 605, 143 A.2d 627, 631 (1958).

" '[T]he purpose of *voir dire* examination is to exclude from the venire those potential jurors for whom there exists cause for disqualification, so that the jury that remains is "capable of deciding the matter before [it] based solely upon the facts presented, 'uninfluenced by any extraneous considerations.' " ' "

*Boyd,* 341 Md. at 435, 671 A.2d at 35 (quoting *Hill v. State,* 339 Md. 275, 279, 661 A.2d 1164, 1166 (1995)).

A juror's having had prior experience as a juror, witness, victim or defendant in a criminal proceeding of any kind, or in one involving a crime of violence, is not *per se* disqualifying. It is even less tenable to argue that a juror is disqualified simply because of the experience of a member of the prospective juror's family or on the part of a close personal friend. *See Yopps v. State,* 234 Md. 216, 221, 198 A.2d 264, 267, *cert. denied,* 379 U.S. 922, 85 S.Ct. 279, 13 L.Ed.2d 336 (1964) (holding in prosecution for daytime housebreaking, where the accused sought on *voir dire* to identify victims, or family members of victims, of the crime of burglary, that the question "sought to [be] propounded to the jury did not relate to a cause of disqualification under the circumstances.").

Consequently, Perry's contention really is addressed to whether the inquiries requested by him were "reasonably

likely to reveal cause for disqualification," based upon partiality or bias. *Davis,* 333 Md. at 35, 633 A.2d at 871. Under the circumstances of the instant matter, there was not "a demonstrably strong correlation between the status in [Perry's expanded *voir dire* ] question and a mental state [of a venireperson] that gives rise to cause for disqualification." *Id.* at 37, 633 A.2d at 872.

Prior to jury selection, Perry and the State respectively submitted their proposed *voir dire* questions to the court; the court modified them and then furnished its modified questions to counsel. The court and counsel then conferred on the record. At that conference the working draft of the question in issue was limited to a criminal homicide proceeding. Perry requested that "criminal homicide" be changed to "criminal proceeding." The court denied the request because

"it simply provokes such a huge response which would require follow-up questions galore, and we would have to sit here and listen to each incident that the prospective juror has experienced over their lifetime, which will consist of, no doubt, some type of larceny and who knows what else."

Perry argued that "a stolen bicycle" could generate bias, but the court noted that it would also ask a general question (which it did) directed to any reason why a prospective juror could not be fair and impartial.

Perry then requested that "any crime of violence" be added to the question. Pursuant to that request the court expanded the question, using the phrase, "aggravated assault." Perry objected "just for the purposes of the record...."

The *voir dire* question to which Perry objects was asked on the second day of jury selection of a venire then consisting of 150 persons. Thirty-nine prospective jurors responded affirmatively to the question, and each of them was then individually questioned by the court at the bench, out of the hearing of the other venirepersons.

Of the persons responding, one was the victim of a sexual assault, and two others acknowledged being victims of an assault. Seven members of the venire had a spouse, child, or

sibling who was the victim of an aggravated assault. The relationships of the other, affirmatively-responding, potential jurors to victims of murder or aggravated assault ranged from aunt, nephew, and cousin, to friend and to relatives of friends. The prior experience of some of the responding venirepersons was that of a juror. Four or five of the prospective jurors were related to or knew persons who had been convicted of the described crimes. These included one venireperson whose high school friend had been executed by the State of California for rape and murder. The net cast by the question also drew in a professional advocate for abused children, a criminal defense attorney who was a former prosecutor, persons engaged in law enforcement and their relatives, people who were responding to a prior question, and one person who did not understand the question. The crimes which the responding jurors considered to be embraced by the question included murder, suicide, conspiracy to commit murder, rape, kidnapping, drug trafficking, child abuse, sexual assault, armed robbery, street muggings (with and without the use of a knife), and various batteries and assaults. The questioning of the thirty-nine jurors who responded affirmatively to the subject question resulted in the court's excusing ten for cause.

A trial court's process of determining whether a proposed inquiry is *reasonably* likely to reveal disqualifying partiality or bias includes weighing the expenditure of time and resources in the pursuit of the reason for the response to a proposed *voir dire* question against the likelihood that pursuing the reason for the response will reveal bias or partiality. Here, the charges against Perry were murder and conspiracy to commit murder. The court exercised its discretion to identify, not only relatives and friends of murder victims, but also the victims, and relatives and friends of the victims, of aggravated assault. Without abusing its discretion, the circuit court could conclude under the circumstances here that there was not a reasonable likelihood of uncovering a disqualification based on some venireperson's connection, even as a victim, to some other class of crime. The circuit court was not required to enlarge the question.

Perry submits that the court was obliged to modify "aggravated assault" to "any crime of violence" in order to capture responses relating to robbery. He asserts that the failure to do so was prejudicial because taking by the perpetrator of the check cashing cards of Mildred Horn constituted robbery, even though it was not charged. There are at least two answers to this contention. First, robbery, which includes an intent to steal, was not part of the State's theory of the case. It was the State's theory that the taking of the check cashing cards was merely a cover to make the entry into the house and the murders appear to be part of a burglary. Indeed, in its closing argument on guilt or innocence the State argued that the entry was not a burglary, but a "hit." Second, the prospective jurors understood the question to include robbery, as indicated by the fact that at least seven of those who responded to the question that referred to "aggravated assault" described robbery in their responses.

## II

In the course of the trial and in the State's final arguments the jury heard a second-generation audiotape recording, twenty-two seconds in length, of a telephone conversation between persons identified as Perry and Horn. It was State's Exhibit 312. During a search of Horn's residence in Los Angeles that was conducted on March 12, 1993, pursuant to a search warrant, the police seized the cassette, State's Exhibit 342, from which Exhibit 312 was made. It appears that the only portion of the contents of Exhibit 342 that was played for the jury in the instant matter is that portion reproduced on Exhibit 312. Consequently, we shall discuss the evidentiary ruling complained of by Perry only in terms of Exhibit 312.

Perry contends that Exhibit 312 was inadmissible under the legislatively created exclusionary rule set forth in Md.Code (1974, 1995 Repl.Vol.), § 10–405 of the Courts and Judicial Proceedings Article (CJ). CJ § 10–405 is part of the subtitle, "Wiretapping and Electronic Surveillance," of the Evidence Title of the CJ Article. The trial court admitted Exhibit 312 because Perry had not filed a pretrial suppression motion as

required by Maryland Rule 4–252 and because the court found a want of good cause to waive that rule's requirements.

Maryland Rule 4–252(a) in relevant part reads:

"In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

. . . .

"(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification[.]"

Under subsection (b) of the Rule, such a motion "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213(c). . . ." [1] The first appearance of defense counsel was on August 23, 1994. Perry filed a motion to suppress on September 9, 1994, which, among other things, sought suppression of the results of certain wiretaps, conducted under court orders. The tape recordings that became Exhibits 312 and 342 were not challenged in the motion, and the challenges to the wiretaps were unsuccessful.

After the jury had been empaneled, opening statements were had on September 13, 1995, and the first evidence for the State was introduced. In its opening statement the State advised the jury that it would be hearing a tape recording of Horn talking to Perry. On September 19, 1995, the fifth day of trial, Horn's older daughter, Tiffany Horn, testified for the State. Based upon her having earlier listened to Exhibit 312, but without playing it for the jury, she identified one of the voices as that of Horn. Thereupon, Exhibit 312 was marked for identification.

The State also elicited the following testimony from Tiffany Horn:

---

1. Maryland Rule 4–252(b) also contains an exception applicable when discovery discloses the basis for a motion to suppress, but Perry does not contend that that exception applies here.

"Q. And do you recall if he [Horn] had an answering machine there [in his Los Angeles residence]?

"A. Yes.

"Q. And do you remember whether there were any cassette tapes that go with the answering machine?

"A. Yes."

Exhibits 342 and 312 were admitted into evidence on the sixth day of trial, September 20, 1995, during the examination of Detective Craig Wittenberger of the Montgomery County Police Department who had participated in the search of Horn's residence. Perry objected for lack of relevance and on the ground that the quality of the sound reproduction was so poor that the tapes could not accurately present that which they purported to record. The court overruled the objection without prejudice to Perry's renewing the objection when the State undertook to play Exhibit 312 before the jury.

The State sought to play Exhibit 312 before the jury on September 28, the tenth day of trial, while Cynthia Turner, the wife of Thomas Turner, testified for the State. Perry renewed his objection. The trial court listened to the tape out of the presence of the jury and overruled the objection.[2] When Exhibit 312 was played before the jury, Cynthia Turner identified the "lighter" of the two voices which did most of the talking as Perry's voice.

It was on September 29, the eleventh day of trial, during the State's case in chief, that Perry for the first time moved to suppress Exhibit 312 on the ground that it was an unlawful intercept under the Maryland wiretap statute, CJ §§ 10–401 through 10–414. Defense counsel represented to the court that his "neurons connected" while he had been driving home from his office the previous evening. Perry submitted that the State's theory would be that Horn had recorded a tele-

---

2. The court would not admit into evidence, however, a transcript, prepared by the State, of the content of Exhibit 312. In essence the court ruled that determining what was said on the tape would be for the jury, based on its conclusions from listening to the tape itself.

phone call to him which originated in Maryland and which Perry made at approximately 5:12 a.m. on March 3, 1993, from a pay phone at the Denny's restaurant in Gaithersburg. Perry argued that there was no evidence that all of the parties to the telephone conversation had consented to the recording of the conversation or of any portion of it. Perry urged as possible remedies: first, that further playing of, and reference to, Exhibit 312 be prohibited; second, that the jury be instructed to disregard prior testimony concerning the identity of the voices; third, that a mistrial be granted; and fourth, that the indictment be dismissed if Exhibit 312 had been presented to the grand jury. The State argued that the General Assembly never intended to prohibit the use of a recording, if made by one coconspirator, of coconspirators acting in concert in furtherance of the conspiracy. Further, the State argued, Perry's motion and objection came too late.

The trial court overruled Perry's objection, finding a waiver based upon the failure timely to raise the issue that Exhibit 312 was an unlawful interception under the Maryland wiretap statute. The trial court also stated that it "does not find any good cause to waive the requirements of Rule 4–252." Noting that the trial was then in its fourth calendar week, the circuit court stated that revisiting the issue of suppression of a tape that had already been played to the jury would create other substantial problems.

In his brief to this Court, Perry relies on CJ § 10–402(a), providing in part that "it is unlawful for any person to . . . [w]ilfully intercept . . . any wire, oral, or electronic communication," except as otherwise specifically provided in the statute. Under CJ § 10–402(c)(3) it is lawful to

"intercept . . . a wire, oral, or electronic communication where the person is a party to the communication and where all of the parties to the communication have given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State."

Perry further argues that, under *Mustafa v. State,* 323 Md. 65, 591 A.2d 481 (1991), the Maryland wiretap statute governs whether a communication has been unlawfully intercepted when the product of the interception is offered in evidence in a Maryland court, that the interception resulting in Exhibit 312 was unlawful under the policy of the Maryland statute, and that the exclusionary rule ordained by the Legislature in CJ § 10–405 applies. Perry submits that this Court may consider these matters on direct appeal because the trial court abused its discretion by failing to find good cause to excuse the waiver in the exercise of the power conferred under Md. Rule 4–252(a).

Alternatively, Perry asks this Court to rule on this direct appeal that trial counsel's failure to file a timely motion to suppress directed to Exhibit 312 denied Perry the effective assistance of counsel.[3] At oral argument in this Court counsel for Perry assured us that, after a complete explanation of the ramifications, Perry has decided to urge this Court to decide on the present record whether defense trial counsel's performance was deficient and, if so, whether Perry was prejudiced, under the holding in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In this Court the State submits that there was a clear waiver, that the trial court did not abuse its discretion in declining to relieve from the waiver, and that all of the other issues sought to be raised by Perry concerning the tape will have to be explored in proceedings under the Maryland Post Conviction Procedure Act, Md.Code (1957, 1996 Repl.Vol.), Art. 27, §§ 645A through 645J.

## A

Perry's alternative contentions can be considered together because the response to both is the same, namely, a full evidentiary hearing is required to resolve Perry's contention

---

**3.** On this appeal Perry is represented by different counsel from trial counsel.

that Exhibit 312 should have been suppressed under the Maryland wiretap statute. Under Rule 4–252(b) the time within which Perry should have moved to suppress Exhibit 312 expired over one year before the trial started. Further, the State ordinarily is entitled to at least fifteen days within which to respond to a suppression motion. Rule 4–252(f).

If, when Perry actually made his motion, a suppression hearing were to be held during a recess in this jury trial, either party could have generated factual issues that required a full evidentiary hearing. Because Perry's objection came so late, the State had never been required to focus on the contention that the Maryland wiretap statute excluded Exhibit 312. Whether the Maryland wiretap statute applies to Exhibit 312 does not lack legal complexity, and the State would have been entitled to time to research the issues. Moreover, uncovering and presenting facts bearing on issues at such a suppression hearing in this case might require locating, interviewing, and obtaining the attendance at the hearing of, persons who, at relevant times, had resided in Los Angeles or in Detroit.

The State ordinarily is bound on appeal of a suppression hearing issue by the record made at the suppression hearing. *See Trusty v. State,* 308 Md. 658, 521 A.2d 749 (1987) (where defendant on appeal from judgment of conviction claims error in denial of suppression motion, the State may not look beyond the suppression hearing record to the trial record for support of the denial of the motion). Consequently, in order to approach the instant matter fairly, the parties should be given substantially the same opportunity to develop a factual record, and legal arguments based thereon, in presenting and responding to Perry's belated suppression motion that they would have enjoyed in presenting and responding to a pretrial suppression motion. For this reason, the trial court acted well within its discretion in refusing to interrupt the trial in order to conduct a belated suppression hearing for which neither party had the opportunity adequately to prepare. Even though Perry is now willing to treat the trial

record as a suppression hearing record, that waiver cannot deprive the State of the procedure to which it is entitled.

For much the same reason, we reject Perry's invitation to decide his claim of ineffective assistance of counsel on the present record. First of all, no factual determinations have been made by the trial judge. Perry's arguments assume certain facts, but it is not the function of this Court to find the primary facts, or in the first instance to draw inferences from undisputed facts that bear on a suppression issue.

This Court ordinarily has required claims of ineffective assistance of trial counsel to be developed on post conviction, where a full, factual record can be made. It is true that, not uncommonly, the inadequacy of the record on direct appeal concerns possible tactical decisions by trial counsel, whereas, in the instant matter, defense trial counsel represented to the circuit court that he had not earlier thought of the telephone intercept argument, despite having tried to think of a basis for keeping Exhibit 312 out of evidence. Here the inadequacy of the record includes the lack of fact-findings bearing on whether there was a violation and whether it was willful. *Compare, e.g., Walker v. State,* 338 Md. 253, 658 A.2d 239 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995) (where the accused was voluntarily absent from trial, and defense counsel did not object to evidence, cross-examine, call witnesses or argue, issue of ineffectiveness was left for post conviction in order to develop a full record); *Colvin v. State,* 299 Md. 88, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984) (general claims of ineffectiveness in a capital case); *Harris v. State,* 295 Md. 329, 455 A.2d 979 (1983) (in capital murder case, alleged ineffectiveness of counsel as it related to accused's guilty plea left for post conviction consideration); *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982) (alleged ineffectiveness in failing to develop a coherent defense theory left for post conviction consideration). We have also ordinarily left for post conviction review claims of error on direct appeal that the trial court foreclosed argument by defense counsel when counsel made no objection. *See*

*State v. Brown,* 324 Md. 532, 597 A.2d 978 (1991) (at conclusion of suppression hearing); *Cherry v. State,* 305 Md. 631, 506 A.2d 228 (1986) (before announcing verdict of guilty in bench trial); *Covington v. State,* 282 Md. 540, 386 A.2d 336 (1978) (same).

Consequently, Perry's contention that Exhibit 312 was improperly admitted and should have been suppressed is not before us on direct appeal. This ruling, and our affirmance of the judgment of conviction in this case, is without prejudice to Perry's raising on post conviction review his contention that Exhibit 312 should have been excluded under the Maryland wiretap statute.

## B

Before this Court, as well as before the circuit court, the arguments for finding waiver, and for relieving from waiver, have revolved around Md. Rule 4–252(a). We note, however, that CJ § 10–408(i) of the Maryland wiretap statute reads in part as follows:

"(1) Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any intercepted wire, oral, or electronic communication, or evidence derived therefrom, on the grounds that:

"(i) The communication was unlawfully intercepted;

. . . .

"(2) This motion may be made before or during the trial, hearing, or proceeding. If the motion is granted, the contents of the intercepted wire, oral, or electronic communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this subtitle."

CJ § 10–408(i) was enacted by Chapter 692 of the Acts of 1977, and became effective July 1, 1977. As introduced, the proposed statute would have read that the motion to suppress "shall be made before the trial. . . ." 1977 Md. Laws at 2815.

The bill was amended in the course of passage to provide that the motion "may be made before or during the trial...."[4]

It was unnecessary for Perry to have referred the trial court specifically to CJ § 10–408(i) in order to preserve his argument that the trial court should have considered his mid-trial motion to suppress. We shall assume, *arguendo*, that CJ § 10–408(i) conferred on Perry a procedural right to seek during his trial suppression of Exhibit 312 on the ground that it was an unlawfully intercepted communication. Nevertheless, we cannot determine on the present record whether such a hearing would have resulted in the suppression of Exhibit 312. The same rationale as to the absence of a record dealing with the merits of suppression that we applied in Part II.A applies to this Part II.B. Consequently, we do not address CJ § 10–408(i) on this direct appeal, but this ruling, likewise, is without prejudice to Perry's relying on CJ § 10–408(i) in a post conviction proceeding.

### III

Mildred Horn's sisters and the Horns' adult daughter challenged in civil legal proceedings Horn's right, *inter alia*, to receive distribution from the trust that had been established for the benefit of Trevor Horn. Horn's deposition in that

---

4. The provisions now found in Md. Rule 4–252(a)(3), requiring a pretrial motion to suppress an unlawful interception of wire or oral communication, were included in former Rule 736.a which was recommended to this Court in the Fifty-third Report of the Standing Committee on the Maryland Rules of Practice and Procedure. This Court adopted that report by an order dated January 31, 1977, effective July 1, 1977.

Thus, both CJ § 10–408(i) and former Rule 736.a became effective on the same date. The different approaches manifested by the two enactments were never directly reconciled.

Former Chapter 700 of the Maryland Rules, including Rule 736.a, was repealed when present Title 4 of the Maryland Rules was adopted effective July 1, 1984, pursuant to the Eighty-seventh Report of the Rules Committee.

Thereafter, CJ § 10–408(i)(1) and (2) were repealed and reenacted by Chapter 607 of the Acts of 1988 when the General Assembly inserted "electronic communication" into each of those sub-subsections, without otherwise altering the statute.

litigation was taken on July 6 and 7, 1994. At Perry's murder trial the State, over objection by Perry, read to the jury portions of Horn's deposition. Perry now argues that the trial court erroneously overruled his objection.

In his deposition Horn admitted that he had the number of Marsha Webb's long distance telephone calling credit card, but he denied

—that he used the card number after August 1992, or, at the latest, after January 1993;

—that he had telephoned Perry at any time utilizing the card number;

—that he had telephoned Perry at any time without utilizing the card number;

—that he had received at any time a telephone call from Perry;

—that he had allowed another person at any time to use the card number; and

—that he had any contact with Perry on March 2 or 3, 1993.

One ground on which the trial court admitted Horn's statements was the hearsay exception for the declarations of a coconspirator during the course and in furtherance of the conspiracy. Perry submits that Horn's statements are hearsay, that they are not within the coconspirator exception, and that they are therefore inadmissible. Perry further argues that the statements are irrelevant. We shall consider relevancy first.

The relevance of Horn's having made the statements is that their content directly conflicts with other evidence introduced by the State tending to prove communications between Perry and Horn by use of Webb's telephone credit card. If the jury were to find that the communications between Perry and Horn in fact took place, and that Horn was lying in that respect at his deposition, then the jury could infer that Horn sought to disassociate himself from Perry because of a consciousness of guilt. Accordingly, the deposition state-

ments are relevant because they tend to make it more likely that there was a conspiracy between Perry and Horn.

█ Perry submits that our holding in *State v. Rivenbark*, 311 Md. 147, 533 A.2d 271 (1987), prevents the State's use against Perry of Horn's declarations that were proved by means of Horn's deposition. *Rivenbark* rejected "the theory that every criminal conspiracy includes, by implication, a subsidiary conspiracy to conceal evidence of the substantive offense that the conspirators agreed to commit." *Id.* at 158, 533 A.2d at 276. In addition, *Rivenbark* adopted the view set forth in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), "that a co-conspirator's statement is inadmissible unless it was made before the attainment of the conspiracy's central objective." *Rivenbark*, 311 Md. at 158, 533 A.2d at 276. As Perry analyzes the record in the instant matter, the central objective of the conspiracy was accomplished when the murders were committed. Further, Perry submits that there is no evidence of any agreement, as part of the alleged conspiracy, to suppress or conceal after the substantive offenses had been committed so that, even if the jury believed that Horn was trying to conceal the conspiracy by lying at his deposition, *Rivenbark* bars viewing that conduct as incidental to, or part of, the alleged conspiracy.

The aspect of *Rivenbark* relied upon by Perry is not applicable because the central objective or principal aim of the conspiracy, under the State's evidence, was to obtain the corpus of the trust that had been established for the initial benefit of Trevor Horn. When Horn made the statements on deposition, that objective had not been attained. The portion of our opinion in *Rivenbark* that applies to the instant matter points out that

"many decisions that appear to endorse the theory of an implied ongoing conspiracy of concealment actually hold only that a conspiracy endures through acts of concealment performed *before* the conspirators finally achieve their main purpose. For example, burglars and robbers must hide while dividing the proceeds of their crime; thieves must

misrepresent their title in order to dispose of stolen property, and arsonists must convince insurers that property damage was accidental rather than intentional."

311 Md. at 157, 533 A.2d at 276.

When admitting the evidence from Horn's deposition the trial court indicated that it was applying an implied conspiracy of concealment theory. We noted in *Rivenbark*, however, that courts endorsing that theory "fail to consider the possibility of placing their decisions on the narrower ground that the conspirators had not achieved their principal aim when the challenged statements were made." *Id.*

*State v. Buschkopf*, 373 N.W.2d 756 (Minn.1985), illustrates the central purpose analysis in the context of a conspiracy to murder. There were at least three coconspirators, the widow of the murder victim, the actual killer, and the witness. One theory on which the trial court had admitted against the accused widow the killer's statements to the witness was that the conspiracy had as its object collecting the proceeds of the insurance on the victim's life. *Id.* at 765. Inasmuch as the insurance proceeds had never been collected, the statements were made while the main object of the conspiracy remained undone. The killer's declarations included rehearsing the witness on a false alibi. These statements furthered the conspiracy "[s]ince detection of murder by the beneficiary would also defeat a claim to the insurance proceeds...." *Id.* at 765–66.

Strongly analogous to the murder for gain conspiracy in the instant matter are the arson for gain conspiracy cases. Among these, *United States v. Xheka*, 704 F.2d 974 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), is frequently cited. That conspiracy involved four persons, two brothers who were the owners of the restaurant that was deliberately burned, the actual arsonist, and the intermediary between the owners and the arsonist. The fire occurred on July 25, 1976, and, at the owners' trial, the government introduced a tape, recorded by the intermediary, of a conversation between the intermediary and the arsonist

that took place in July 1979. *Id.* at 977–78. The defendants argued that "an agreement to conceal a completed crime does not extend the life of a conspiracy." *Id.* at 985. The court agreed that "[h]ad defendants conspired to destroy [the restaurant] simply for the joy of destruction this argument would have merit, but that was not the case." *Id.* The government had established "the poor financial condition of the business, [one owner's] claim that he could afford to hire [the arsonist] because the restaurant was insured, and that the [owners] were still seeking payment from the insurance company." *Id.* The court concluded that "[a]ll of these factors support the theory that recovery of the insurance proceeds was the primary goal of the conspiracy." *Id.* The statements were also in furtherance of the conspiracy since their purpose was to keep the arsonist in the conspiracy "and thereby facilitate the [owners'] attempt to obtain the insurance proceeds." *Id.* at 986.

Other arson cases hold that, where the principal objective of the conspiracy is to obtain fire insurance proceeds, coconspirators' statements made after the fire that are designed to conceal the conspiracy and the substantive crime are in furtherance of that principal aim and within the hearsay exception. *See United States v. Kaden,* 819 F.2d 813 (7th Cir.1987); *United States v. Howard,* 770 F.2d 57 (6th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *United States v. Zabic,* 745 F.2d 464 (7th Cir.1984); *United States v. Burton,* 724 F.2d 1283 (7th Cir.1984); *United States v. Mennuti,* 679 F.2d 1032 (2d Cir.1982); *People v. Peltz,* 701 P.2d 98 (Colo.App.1984); *Allen v. Commonwealth,* 176 Ky. 475, 196 S.W. 160 (1917); *Osborne v. State,* 99 Miss. 410, 55 So. 52 (1911).

The same analysis of the hearsay exception has been applied in conspiracies to rob, where the declaration was made before the loot was divided, *see, e.g., Atkins v. United States,* 307 F.2d 937 (9th Cir.1962); *Murray v. United States,* 10 F.2d 409 (7th Cir.1925), *cert. denied,* 271 U.S. 673, 46 S.Ct. 486, 70 L.Ed. 1144 (1926); *State v. Kidd,* 239 N.W.2d 860 (Iowa 1976), and in a conspiracy to transport a stolen automobile in inter-

state commerce where the declaration was made before payment was received from the sale of the stolen vehicle, *see Koury v. United States,* 217 F.2d 387 (6th Cir.1954). Similarly, it has been held that the object of a kidnapping conspiracy, in which the conspirators anticipated that the ransom would be paid in marked currency, was not attained until the ransom money had been exchanged for unmarked money. *McDonald v. United States,* 89 F.2d 128 (8th Cir.), *cert. denied,* 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352 (1937). And, the object of a conspiracy to suppress bidding for the purchase of government-owned timber was not attained until the timber was cut and the United States was paid the anti-competitive price. *United States v. Walker,* 653 F.2d 1343 (9th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).

Perry attempts to avoid the rule recognized in the foregoing cases by submitting that he and Horn had different objectives. This argument emphasizes that there is no evidence that Horn was to pay Perry anything after the murders had been committed, much less that there was any evidence that Perry was to share in the hoped for distribution of the trust corpus. Viewing the evidence most favorably to the State, Perry concludes that his aim in the conspiracy was to receive the money paid in advance, while Horn's aim was to receive the trust fund.

The legal proposition that Perry would have us adopt is summed up as follows: "What Lawrence Horn's personal goals were upon his wife and child's death were irrelevant unless there is evidence that they were also Mr. Perry's goals." Reply Brief of Appellant at 17.

 We do not agree with Perry's legal premise. In our view the relevant proposition is correctly stated in *United States v. Hamilton,* 689 F.2d 1262 (6th Cir.1982), *cert. denied sub nom. Wright v. United States,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). There the court stated:

"It is academic that to be a party [to a conspiracy] one must have *some* stake in the conspiracy, but that each party need

not have the *same* stake; merely acting for the venture's success is sufficient."

689 F.2d at 1270.

*Hamilton* involved a conspiracy to violate federal statutes prohibiting dealing in explosives without a license. By prearrangement, three men, Reid, Wright, and Salisbury, stole dynamite and caps for sale to mine operators named Hamilton. "The objective of [the former] was to make some easy money, while that of the [latter] was to obtain explosives inexpensively." *Id.* at 1268. There was "no contradiction in the Hamiltons' not having interests identical with the remaining conspirators." *Id.* at 1270. Perry has confused the motive of a conspirator for participating in the conspiracy with the principal aim or object of the conspiracy.

There was no error in admitting portions of Horn's deposition.

## IV

We next consider Perry's assignment of error involving fingerprint comparison evidence presented in the State's rebuttal case. That comparison concerned the fingerprints of others, and Perry contends that it lacked authentication of the record prints. Perry's contention and the State's response require weaving through many facets of the trial, as described below.

On March 6, 1993, three days after the murders for which Perry was convicted in this case, an unidentified female telephoned the Montgomery County police at approximately 7:30 a.m. to report information about the murders. The caller was telephoning from the District of Columbia, and she had directed her call to a nonemergency number of the Montgomery County police. The telephone conversation was recorded, and the informant could be heard to be crying.

The caller said that she had just left a home in the District of Columbia at 916 Westminster Street, N.W. where her girlfriend, a niece of a resident of the home, resided. The

caller said that there she had overheard a conversation that took place in an adjoining room among four African American males. They were in their early twenties, unemployed, and had guns and money. The informant did not know three of the men. She knew the fourth only as "Drunk," but she did not know Drunk's real name. The four men were talking about the shooting of " 'the lady and a nurse and her son.' " " 'They was talking about it and they was saying they watched how after he stopped breathing they maybe was laughing at the boy. . . . ' "

After stating that she was going to get something to eat and promising to call the dispatcher again within ten minutes, the caller terminated the conversation. The recorded conversation was sent by the dispatcher to the homicide unit of the Montgomery County police. The caller never called back.

At Perry's trial, during the defense case, the court permitted Perry to introduce the taped conversation. In opposition to its introduction the State unsuccessfully argued that the contents of the tape were triple hearsay—at the level of the tape, at the level of the first declarant, *i.e.*, the telephone caller, and at the level of the second declarants, *i.e.*, the four men. Perry submitted that the tape was a business record, that the caller was expressing an excited utterance, and that the secondary declarants were making declarations against their penal interests. The trial court ruled that "under the circumstances of this case and based upon the nature of the testimony offered, the defendant is entitled to have the evidence presented to the jury for whatever it is worth." No limiting instruction was requested or given.

Latent fingerprints, none of which matched Perry's, had been found in Mildred Horn's home, on certain contents of her purse, in the garage at her home, and in her motor vehicle. The latent fingerprints were described by witnesses called by the State in its case in chief. They were Mary Ann Horton (Horton), a fingerprint examiner with the Montgomery County police, and Jacob Holmes, who was employed in the same capacity by the Federal Bureau of Investigation (FBI). The

jury heard evidence that latent fingerprints were "of value" if they contained a sufficient number of identifying points to permit matching the latent prints to prints of identified persons in the files of law enforcement authorities. The jury also was told that certain of the latent prints recovered by the investigators were prints of value but that they were "open," *i.e.,* prints of value that had not been matched with those of any identified person. These prints remained open despite having been checked against a data base maintained jointly by Montgomery and Prince George's counties and despite having been checked on a somewhat selective basis against the FBI data base of some twenty-seven million sets of fingerprints of identified persons.

The Montgomery County fingerprint examiner, Horton, was called by Perry as a witness for the defense, after Perry had put into evidence the recorded telephone conversation described above. The defense examination of Horton elicited specifics about the number of open prints submitted for comparison by the investigators of the murders.

In rebuttal to the combination of the anonymous telephone call and the open prints the State produced evidence that described, and that resulted from, its investigation of the information conveyed in the telephone call. On the day that the telephone call was received the police had interviewed the occupants of 916 Westminster Street, and they had put those premises under surveillance.

As a result, four witnesses associated with 916 Westminster Street were called by the State as rebuttal witnesses. They were Mary Kirkland, who had lived at that address since 1975, her son, Kevin Kirkland, age twenty-seven, who was known as "Drunk," her granddaughter, Yolanda Kirkland, and Amanda Byrd, the mother of Kevin Kirkland's child. The female witnesses had identified the female voice on the dispatcher's tape as that of Wanda Thomas, Kevin Kirkland's former girlfriend. Kevin Kirkland testified that he never engaged in a conversation as that described by Wanda Thomas, and he

denied knowing anything about the murders other than what he had heard on the news.

Detective Wittenberger also testified in rebuttal that he had interviewed Wanda Thomas on July 3, 1995, at her apartment at 641 Hamlin Street, N.E., Washington, D.C. An FBI agent also testified on rebuttal that Wanda Thomas had not been picking up her mail at that address for more than a month prior to trial and that she had left no forwarding address with the Postal Service. Neither party called Wanda Thomas as a witness.[5]

Further, as a result of the surveillance, Detective Wittenberger requested that a number of fingerprint cards be examined.

The evidentiary ruling that is the basis for Perry's appellate issue arose when Horton was called by the State as a rebuttal witness. She testified that Detective Wittenberger had requested that she compare the open prints in the investigation with fingerprint cards of certain individuals. Horton identified the fingerprint record cards that she utilized, one of which bore the name of a Keith Kirkland. Perry objected for lack of a foundation. He argued that, in order to authenticate the fingerprint records, it was necessary for the person who had taken the original, inked fingerprints to testify that the fingerprints on a card were those of the individual named on the card.

The court overruled the objection, ruling that "it is admissible to show the thoroughness of the investigation." The court further advised that Perry was entitled to a limiting instruction, if he wanted one, but Perry declined.[6] Horton then

---

5. Perry does not contend that the State failed to advise him of the anonymous call or of the information developed concerning the identity and location of the caller.

6. The trial court offered an instruction

 "that says that, 'This is offered simply to show the thoroughness of the investigation. It is not offered to prove that she looked at the

testified that none of the open prints matched the fingerprints on the record cards that she had received from Detective Wittenberger.

Horton was also shown a fingerprint record card for Kevin Kirkland, obtained by an FBI agent from the FBI fingerprint data bank on the day before Horton's rebuttal testimony. Horton testified that Kevin Kirkland's fingerprints did not match any of the open prints.

The foregoing review makes plain that the fingerprint cards identified by Horton in the State's rebuttal case were not offered to prove the identity of an accused as the criminal agent in the offense charged. Consequently, we express no opinion on the authenticity requirements where fingerprint record evidence is offered for that purpose. Here, the purpose of the evidence was to show what the police had done by way of investigation after the receipt of the information from an anonymous telephone caller, and the evidence in the State's case in chief had already explained how fingerprint records are used in police investigations.

In this respect Perry's argument is much like that which we rejected in *Colvin-el v. State,* 332 Md. 144, 630 A.2d 725 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994). There, during the State's presentation in chief a Baltimore City fingerprint examiner testified to the match of latent prints obtained at the crime scene by Baltimore County police with a Baltimore City fingerprint record card in the name of the defendant. The defendant contended that authentication was lacking. We held that the evidence was admissible for the purpose for which it had been offered, namely, to explain how the investigation had focused on the defendant. *Id.* at 161, 630 A.2d at 733. There, as here, the trial court offered to give a limiting instruction, but the defendant did not expressly request one, and we held that any

fingerprints of Mr. A—there is no evidence as to whether these are the fingerprints of Mr. A or not.' "

right to a limiting instruction had been waived. *Id.*[7]

Accordingly, we hold that the trial court did not err in admitting Horton's testimony on rebuttal concerning fingerprint comparisons.

## V

Perry contends that the trial court erred by failing to instruct the jury in the language of Maryland State Bar Association, Inc., Maryland Criminal Pattern Jury Instruction No. 3:19 (1986, 1995 Supp.). That pattern instruction reads:

"You have heard testimony that _____ made a statement [before trial] [at another hearing] [out of your presence]. Testimony concerning that statement was permitted only to help you decide whether to believe the testimony that the witness gave during this trial.

"It is for you to decide whether to believe the trial testimony of _____ in whole or in part, but you may not use the earlier statement for any purpose other than to assist you in making that decision."

There is no merit to the contention because (A) the issue has not been preserved, (B) the requested instruction did not accurately state the law under the circumstances of this case, (C) the instruction actually given fairly covered the matter in the requested instruction under the circumstances of this case; and (D) with respect to the part of the case to which the requested instruction may have been applicable, the error, if any, was harmless beyond a reasonable doubt.

## A

On the day before the close of the evidence the court and counsel conferred on the parties' requested instructions. At

---

**7.** We also held in *Colvin-el* that any error in the above-described use of the fingerprint card was harmless beyond a reasonable doubt. *Colvin-el v. State,* 332 Md. 144, 161, 630 A.2d 725, 733–34 (1993). This was because a set of inked prints was identified at trial by the police officer who had rolled them from the fingers of Colvin-el, and that set also matched the latent prints from the crime scene.

the conference Perry requested that the above-quoted instruction be given "without any reference to particular names and particular witnesses." The State pointed out that Perry's request would not be an entirely accurate statement of the law because certain prior inconsistent statements, acknowledged by a State's witness, Pauline McGhee (McGhee), could be argued by the State as substantive evidence. The trial court reserved ruling on Perry's requested instruction at that time. The next day the court ruled that it would not grant the requested instruction, indicating uncertainty as to how the requested instruction helped Perry and indicating that the requested instruction would confuse the jury.

In the instructions actually given, the court gave a list of illustrative factors that could be used in assessing the credibility of witnesses. At the conclusion of the charge, defense counsel, after brief references to another instruction, said:

"The only other point I would add, Your Honor, is during the instruction which dealt with credibility of witnesses there were eight different subtopics, and the ninth one I don't believe that the court read.

"THE COURT: Okay. I have only got eight.

"[DEFENSE COUNSEL]: Oh, you only have eight. Okay. The ninth one is my version. It is you should consider such instructions as the extent to which a witness's testimony in the court differed from the statements made by the witness on any previous occasion."

After the court stated that this requested addition to the charge would be given, and in response to the court's question concerning any other request or objection, defense counsel stated, "[W]e would preserve the records and we would request the instructions which the court has already read indicating that."

■ The pattern instruction differs from the supplemental instruction which the court gave (see V.C, *infra*) by the former's expressly stating that the jury "may not use the earlier statement for any purpose other than to assist" in making a credibility determination. Perry's general reference

to his previously submitted requested instructions does not preserve his point that the supplemental instruction failed to limit the use solely to credibility determinations. His general exception, again requesting all previously requested instructions, does not satisfy Maryland Rule 4–325(e) with respect to the limited use point. That rule reads in relevant part as follows:

> "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."

Here, Perry's requested supplement to the change focused on the subject of prior inconsistent statements, and the court advised the jury that it could use prior inconsistent statements in assessing whether to believe a witness. For Perry now to argue that the trial court should also have told the jury that it could use prior inconsistent statements only for credibility purposes, when Perry did not specify that feature in his exception, operates to sandbag the trial court and violates Maryland Rule 4–325(e).

### B

In any event, there was no reversible error in not charging in the full language of the pattern instruction. Perry sought an instruction applicable to all impeached witnesses in the case. For that reason, it did not state the applicable law, and the trial court was not required to grant it. Maryland Rule 4–325(c); *Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Mack v. State*, 300 Md. 583, 479 A.2d 1344 (1984).

In its case in chief the State had called McGhee, Perry's fiancee. The two had lived together for about eight years. On direct examination McGhee testified that "[m]any a times" Perry had sent her off to cash Western Union money transfers for him in McGhee's name. The State, then examining

McGhee by leading questions, referred her to a written statement dated November 2, 1994, signed by her, and given to investigators during an interview in Wayne County, Michigan. McGhee admitted in her testimony that the signed statement acknowledged that she had not cashed Western Union money orders for Perry other than on the occasions referred to in the statement, *i.e.*, inferentially, the money orders from Horn. Although the trial court did not permit the State to introduce the written statement into evidence, at the conference on jury instructions the court accepted the State's position that it could argue, as substantive evidence, McGhee's acknowledgement on the witness stand of what she had admitted in her signed statement.

The State's position concerning substantive use of the content of McGhee's signed statement was then predicated on *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). That holding is now codified in Maryland Rule 5–802.1.[8] On this appeal Perry does not contend that the trial court erred in permitting the State's argument based on McGhee's written statement's content. Inasmuch as Perry's requested instruction was not an accurate statement of the law, at least as it pertained to the impeachment of McGhee, the trial court did not err in refusing a universal instruction in the language of Pattern Jury Instruction 3:19.

## C

The supplemental instruction that the court gave concerning the use of prior inconsistent statements was as follows:

---

**8.** Maryland Rule 5–802.1, in relevant part, reads:

"The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

"(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement[.]"

"Ladies and gentlemen, I have one additional instruction to give you, which is very brief. One of the instructions that I gave you had to do with the credibility of witnesses and how you decide the credibility of witnesses, and I suggested that you might want to consider a list of different things.

"Actually, it was a list of about eight things, and I am going to give you one more thing that you can consider in the context of deciding the credibility of the witnesses. When I say you can consider it, that means that you can think about it and it is up to you to decide what, if any, consideration. or weight you want to give to this factor.

"It is as follows: Whether and the extent to which the witness' testimony in the court differed from the statements made by the witness on any previous occasion. So you can consider that also when you are considering the credibility of the witnesses."

Given the *Nance* ramifications of McGhee's statement, the charge actually given fairly presented the applicable law. Maryland Rule 4–325(c).

### D

In Perry's brief to this Court the only witness, other than McGhee, whose testimony Perry claims was affected by the denial of the requested instruction, is Thomas Turner (Turner). In his direct examination as a witness for the State, Turner testified to certain admissions by Perry indicating contact between Horn and Perry. On cross-examination Turner acknowledged that he had given completely contradictory testimony to the grand jury and that, subsequent to his grand jury testimony, he had been given immunity.

Under *Nance*, Perry was entitled to argue the substantive admissibility of Turner's grand jury testimony, just as the State argued substantively from McGhee's written prior inconsistent statement. Further, the error, if any, in the supplemental instruction was the absence of a limitation on use solely to credibility determinations. With respect to the testimony of Turner, Perry is not prejudiced by the absence of the

limitation. If the jury considered Turner's grand jury testimony as substantive evidence, and believed it, then the jury would reject Turner's contradictory trial court testimony, which was damaging to Perry. Consequently, the error, if any, is harmless beyond a reasonable doubt.

## VI

Perry asserts that there was insufficient evidence at sentencing of any aggravating factors under Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(d). The aggravating circumstances found by the jury were that the murders were committed pursuant to an agreement or contract for remuneration and that Perry committed more than one offense of murder in the first degree arising out of the same incident. Perry premises his argument on the references to "a separate sentencing proceeding" in Art. 27, § 413(a) and (k)(8). From this Perry concludes that the evidence that was introduced at the guilt or innocence phase of his trial is not automatically a part of the record for consideration at the sentencing phase. Perry apparently does not contend that each witness must testify again or that exhibits must be reintroduced. His point seems to be that the prosecutor in this case failed to move for admission into evidence at the sentencing phase the evidence that had been introduced at the guilt or innocence phase.

We reject this argument. The record made prior to verdict and the record made after verdict and prior to sentence are parts of the same whole, that is, the record in the cause leading up to the final judgment reviewed on appeal. Formal incorporation of the pre-verdict evidence into the post-verdict portion of the record underlying final judgment is not required.

The participants in this criminal cause understood that death penalty cases proceed as described above. When the State was asked by the trial court how it planned to prove the aggravating circumstances the following colloquy took place:

"[PROSECUTOR]: Your Honor, I think that because we have the same jury, we are going to be arguing from the

record of the trial itself. I don't think that we need to nor should we review or revisit any of the evidentiary matters through witnesses. I think we are permitted to do that.

"THE COURT: I think you are, too. Is there any objection to that?

"[DEFENSE COUNSEL]: No.

"THE COURT: It strikes me as an entirely appropriate way to do it. You have the same jury, so you don't have to figure it out.

"[DEFENSE COUNSEL]: Assuming that the same, that this jury will be serving as the sentencing jury, it is very clear that the State can simply rely on the convictions returned by the jury. We would in fact, object to any revisiting of any of the evidence."

The cases that Perry cites to support his argument are distinguishable. *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980) *(Tichnell I )*, and *Tichnell v. State,* 290 Md. 43, 427 A.2d 991 (1981) *(Tichnell II )*, were appeals from separate judgments of conviction. In *Tichnell I* we affirmed the jury verdict, reversed the court imposed death sentence, and remanded for a new sentencing. Tichnell elected resentencing by a jury which necessarily was newly empaneled and composed of different jurors from those who had rendered the guilty verdict in *Tichnell I.* The jury at the second sentencing imposed death, after having had read to it "relevant" portions of the trial transcript from *Tichnell I.* 290 Md. at 49–52, 427 A.2d at 994–95. This Court vacated the death sentence that had been imposed utilizing that procedure. We concluded "that § 413(c) does not permit, over timely objection, the admission in evidence before a *new* sentencing jury of the prior recorded trial testimony to prove the existence or absence of aggravating or mitigating circumstances." *Id.* at 63, 427 A.2d at 1001 (emphasis added). *Tichnell II* is inapplicable here because Perry's sentencing jury is the same jury that heard the evidence on guilt or innocence and rendered the verdict of guilty.

Perry also relies on *Brady v. State*, 226 Md. 422, 174 A.2d 167 (1961), *aff'd*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holding that, on retrial, duplication of evidence from the first trial may be required. *Brady* involved a situation where a new jury was to be empaneled. *Id.* at 430–31, 174 A.2d at 171.

What we stated in *Tichnell II* is applicable here:

"In the usual case in which the prosecutor seeks the death penalty and obtains a qualifying first degree murder conviction, the trial judge and jury which heard the evidence at trial will also be involved in the subsequent sentencing proceeding; therefore, they will be fully conversant with the evidence introduced prior to the commencement of the sentencing hearing."

*Tichnell II*, 290 Md. at 59–60, 427 A.2d at 999. The instant case is the usual case.

## VII

For preservation purposes Perry submits that Maryland's death penalty statute is unconstitutional because it requires mitigating circumstances to be proved by a preponderance; it requires the defendant to establish that claimed mitigating circumstances that are not enumerated in the statute are, in fact, mitigating circumstances; and it requires a death sentence when aggravating circumstances outweigh mitigating circumstances by a preponderance of the evidence.

We have addressed these claims in prior cases and have rejected each of them. *See Grandison v. State*, 341 Md. 175, 231, 670 A.2d 398, 425 (stating that a similar claim, "though made time and time again over the years, has been consistently rejected by this Court"); *Whittlesey v. State*, 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995) (rejecting similar constitutional challenges to Maryland death penalty statute), *cert. denied*, —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Wiggins v. State*, 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991) (finding no merit in challenges to defendant's burden regarding statutorily recognized and other mitigating factors

and to burden of proof), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

## VIII

In addition to considering the arguments advanced by Perry on this appeal, we have also considered the imposition of the death sentence from the standpoint of the factors set forth in Article 27, § 414(e), and we make the following determinations:

(1) The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) The evidence supports the jury's findings of statutory aggravating circumstances under § 413(d); and

(3) The evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances that were found by one or more, but less than all twelve, of the jurors.

*JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.*

BELL, Judge, dissenting.

Maryland Rule 452(a)(3) provides:

(a) Mandatory Motions. In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

\*　\*　\*　\*　\*　\*

(3) An unlawful search, seizure, *interception of wire or oral communication* or pretrial identification. (Emphasis added)

This Rule specifies two (2) methods by which the interception of wire or oral communications may validly be raised.[1] To be

---

1. As the majority points out, the Maryland Wiretap statute, Maryland Code (1974, 1995 Repl.Vol., 1996 Cum.Supp.) § 10–408(i) expressly permits "[a]ny aggrieved person" to move, "before or during the trial,"

sure, the preferred method is by motion filed pretrial. Because, however, the Rule also explicitly permits the court to forgive the failure timely to raise the matter, that method is not absolute.

The petitioner did not file a pretrial motion to suppress the 22 second telephone conversation, taped without, so far as the record reflects, his having consented to its being taped. He did move to suppress prior to the close of the State's case and before the tape had been admitted into evidence. When he interposed the motion to suppress, the court was able to grant the relief sought; the objection was raised at a time when it was within the power of the court to correct the error theretofore made by permitting the State to refer to and rely on the tape to corroborate the testimony of Thomas Turner, to whom the State granted complete immunity. Rather than entertain the-motion, the court ruled that the petitioner, by failing earlier to file a motion to suppress, had waived his objection. That ruling was wrong for either of two reasons: the court failed to exercise the discretion given it by Rule 4–452(a)(3) or it abused its discretion when it refused, under these circumstances, to conduct a suppression hearing outside the presence of the jury. Moreover, the error was not harmless beyond a reasonable doubt. Consequently, I would reverse the judgment of the circuit court.

It is true, as the State argues, that no objection was made by the petitioner to the admissibility of the tape until the fourth week of the trial, after the tape had been identified and played to the jury. At that time, the petitioner's counsel candidly acknowledged that he had failed to comply with the Rule's requirement that the suppression motion be filed pre-

---

on the basis that it was unlawfully intercepted, to suppress the contents of an intercepted wire communication. Although not raised by the petitioner, this section certainly supports his position and buttresses my argument. The rationale offered by the majority for ignoring the clear mandate of § 10–408(i) mirrors that offered as a means of getting around the Rule and, thus to justify avoidance of the merits. As far as I am concerned, it is no more persuasive.

trial. He explained, again candidly, and no one suggested that
the explanation was not genuine, that his co-counsel and he

> have been laboring for months on a variety of things, one of
> those being the issue of how we attempt to deal with the
> [S]tate's introduction of that particular 22–second recording,
> and suffice it to say that as I was driving home from the
> office last night about 8:30 or 9:00 o'clock, the neurons
> connected.

The argument he made in support of the objection he then
interposed, premised on Maryland Code (1974, 1995 Repl.Vol.,
1996 Cum.Supp.) §§ 10–402(a),[2] 10–402(c)(3),[3] and 10–405,[4] of
the Courts and Judicial Proceedings Article, was the same
argument that this Court announced in *Mustafa v. State,* 323
Md. 65, 73–75, 591 A.2d 481, 485–86 (1991). In that case, we
characterized the language of § 10–405 as "unambiguous,"
providing for no exceptions and, thus, "no indication that the
legislature intended to adopt anything but the 'all-encompass-
ing exclusionary rule which it unequivocally fashioned in § 10–
405.'" *Id.* at 74, 591 A.2d at 485 (quoting *Wood v. State,* 290
Md. 579, 584, 431 A.2d 93, 95 (1981)). We then stated that
"one of the clear purposes of the more restrictive consent
provision of the Maryland Act [*i.e.* § 10–402(c)(3) ] is to pre-

---

2. Maryland Code (1974, 1995 Repl.Vol., 1996 Cum.Supp.) § 10–
 402(a)(1) makes "it unlawful for any person to [w]illfully intercept,
 endeavor to intercept, any wire, oral, or electronic communication."

3. Section 10–402(c)(3) allows the "intercept[ion of] a wire, oral, or
 electronic communication where the person is a party to the communi-
 cation and where all of the parties to the communication have given
 prior consent to the interception unless the communication is intercept-
 ed for the purpose of committing any criminal or tortious act in
 violation of the Constitution or the laws of the United States or of this
 State."

4. That section provides:
 Whenever any wire or oral communication has been intercepted, no
 part of the contents of the communication and no evidence derived
 therefrom may be received in evidence in any trial, hearing, or other
 proceeding in or before any court, grand jury, department, officer,
 agency, regulatory body, legislative committee, or other authority of
 this State, or a political subdivision thereof if the disclosure of that
 information would be a violation of this subtitle.

vent 'the unauthorized interception of communications where one of the parties has a reasonable expectation of privacy.'" *Id.*

Rather than argue waiver,[5] the State, at the trial court's request, posited that the recording was admissible because the petitioner and Horn, the co-defendant who made it, were coconspirators. Apparently not satisfied with that argument, the court fell back on waiver. But it applied the waiver analysis in such a manner as to give meaning to only a part of Rule 4–452. I submit that, in so doing, the court failed to exercise the discretion that it possessed to relieve a defendant from a default where there is good cause to do so. This becomes obvious when one focusses on the court's explanation of its ruling.

The court quite properly noted that the motion to suppress is a mandatory motion which must be made before trial and that the petitioner did not file any such motion or raise the issue in any way before trial. Relying on the latter fact, the trial court determined, "on that fact alone" that the issue of the recording's admissibility was waived. From its later remarks, it is even more obvious that it was the petitioner's default in not filing a pretrial suppression motion, or otherwise raising the issue before the jury heard the tape, that the court found dispositive of waiver, rather than the "good cause" requirement, to which it referred in passing. Having acknowledged that an initial default could be forgiven by a finding of "good cause," the court stated:

> Furthermore, the Court notes that when the exhibit was offered yesterday, again there was no objection on this grounds to its admissibility. Indeed there was an objection on other grounds properly raised by counsel and I believe properly ruled on by the Court, but violation of this statute

---

5. The State merely lamented:
 We were prepared to proceed with Mr. Turner and now we are back in a suppression hearing. I would like to know what [the petitioner's counsel] wants. He has given a range of remedies to the Court and I don't know if I am prepared to respond to each one at this point.

was not raised as a basis for excluding the evidence, so once again there was a waiver of any right to objection.

*　　*　　*　　*　　*　　*

The Court also notes that we are in the fourth week of trial and that to revisit the issue of a tape that has already been played to the jury would create substantial other problems that give rise to the reason for the rule to begin with, which is that something like this needs to be dealt with before the trial, not during the trial, but certainly needs to be dealt with before the jury hears it, not after they hear it.

As far as I am concerned, once it is waived, it is waived. I don't think it is partially waived. I don't think that it is appropriate for me to say, well, its in evidence but now the State can't offer further testimony with respect to the identification issue since that is an issue that may be before the jury for them to consider.

It is significant that the court did not even mention the adequacy of the petitioner's reason for failing to raise the issue earlier. Its sole focus, as I have demonstrated, was on the default and the effect that forgiving the default would have on the trial. But the fact that the Rule contemplates both that there will be defaults and that they, on occasion, will be excused, it seems much more appropriate that the emphasis be on why the motion or objection was delayed and whether that reason constituted "good cause." I can only conclude that the court simply failed to exercise discretion in this regard, preferring, as the majority also apparently does, to avoid reaching the merits of the suppression issue.

Even if one could read the record as reflecting that the court did not find "good cause" for the default, it is just as clear in reflecting that, in so finding, the court abused its discretion. I have already demonstrated that the argument that the petitioner's counsel made was consistent with, and foreshadowed by, the *Mustafa* case. Accordingly it was an extremely strong argument in favor of the suppression of the recording. Moreover, there is nothing in the record that suggests that counsel was anything but truthful with respect

to his reason for not earlier raising the suppression issue. Where the argument favoring the result sought by the defaulting party is strong and the evidence of his or her lack of good faith weak, it clearly follows, as far as I am concerned, that the defaulting party is entitled to a hearing on the merits and that a failure to so order is an abuse of discretion.[6] And there was no impediment to the court conducting a suppression hearing without the jury. That is often done when the admission of evidence, offered after the jury is sworn, depends upon the establishment of a factual predicate.

Alternatively, we should address this issue on direct appeal since the record clearly demonstrates that the petitioner's counsel rendered inadequate assistance of counsel. That matter can be and, I submit, must be addressed whenever it is raised on direct appeal and the appeal record is adequate to permit its meaningful review. *Johnson v. State*, 292 Md. 405, 434–435, 439 A.2d 542, 559 (1982). To do otherwise is to waste judicial resources, a commodity that is, to say the least, very precious. I have already pointed out that there is no indication that the court was in any way concerned about the petitioner's counsel's motivation or believed that he acted in bad faith.

The decision in this case not only ducks an issue that I believe has been generated and is ripe for decision, but it ensures that there will be two full appeals. Had this Court, as precedent permits, addressed the merits of the suppression issue, we would be through with this issue, *albeit* the result

---

**6.** I am struck, but not impressed, by the majority's argument premised on the court's need to be fair to the State by ensuring that it had enough time to respond to and prepare for the petitioner's motion to suppress. I remind the majority that the Rule contemplates just this situation, when no motion has been filed pretrial and objection is made for the first time at trial. Moreover, in this situation, when the jury is in the box and the trial is ongoing, this Court has never suggested, or even intimated, that the same time frames apply as in the case of motions that are timely filed before trial. In short, there simply is no basis for that concern.

undoubtedly would not be a welcome one.[7] That the result is not likely to be that which we seek or hope for is no reason not to decide an issue on the merits; after all, that result is not likely to change with the passage of time. All that we have accomplished by this opinion and decision is to ensure that, if nothing happens in the meantime to render it moot, we will have to address the issue in another context. I can not find any justification, and the majority opinion does not provide one, for the expenditure of judicial resources in this fashion.

---

7. It seems crystalline to me that *Mustafa v. State*, 323 Md. 65, 591 A.2d 481 (1991) foreshadows a reversal of the petitioner's conviction, assuming that the issue has not been waived. It is interesting to me that the majority studiously avoids the merits of the case, suggesting to me, at least implicitly, that it does not "buy" the State's co-conspiracy argument. The waiver of the right to challenge the admissibility of the recording by counsel who did not think of it or recognize the holding in *Mustafa* until the fourth week of trial surely does not render effective assistance; hence, I foresee a return of this case to this Court on that basis in very short order.