671 A.2d 33

**Zayde BOYD**

v.

**STATE of Maryland.**

**Trevor BROOKS**

v.

**STATE of Maryland.**

**Nos. 40, 41, Sept. Term, 1995.**

Court of Appeals of Maryland.

Feb. 7, 1996.

432

Nancy S. Forster, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief) Baltimore, for Petitioner.

Gary E. Bair, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief) Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

We granted certiorari in both of these cases to review the identical narrow question: is it an abuse of discretion for a trial judge to refuse a party's request that the judge ask on *voir dire* whether any of the prospective jurors has a physical impairment hindering his or her performance as a juror? Under the common law of this State this Court will prescribe the juror *voir dire* process only as much *as is necessary* to establish that jurors meet minimum qualifications for service and to uncover disqualifying bias. Because Maryland statutory law requires that a thorough assessment of a juror's physical ability to serve take place at earlier stages in the jury selection process, we hold that such a question is not necessary and therefore not mandatory when requested at the *voir dire* stage. The refusal of the trial judge in each of the instant cases to ask such a question was not an abuse of discretion.

I

Zayde Boyd, one of the petitioners, was convicted in the Circuit Court for Baltimore City of attempted armed robbery and related offenses and sentenced to four fourteen-year terms and one five-year term of imprisonment, all to be served concurrently. Trevor Brooks, the other petitioner, was convicted in the Circuit Court for Baltimore City of second-degree murder and handgun offenses and sentenced to concurrent terms of imprisonment of thirty and fifteen years.

During both trials, the defendants' attorneys requested the judges to ask the jurors on *voir dire:* "Does any member of the jury have a physical impairment or ailment that would hinder them in performance as a juror (i.e., bad eyesight, poor hearing)?" In both trials, the judges refused to ask the question. In Boyd's case, Judge David Ross gave no explana-

tion for his refusal to ask the question. Judge Thomas Ward, who presided at Brooks' trial, explained his refusal:

"THE COURT: All right, Counsel. Question 15, I have already covered that. Denied. Question 16, denied. Question 17—well, if a person has a problem with respect to eyesight or hearing, we'll have to make arrangements to help them because people who are disabled have a right to serve on juries.

"MR. GASTON: I understand. I just—

"THE COURT: I don't even know that I—how much I can ever inquire into that.

"MR. GASTON: Well, you can only—you can ask the jurors if anyone has any, did anyone have any difficulty in hearing me and my questions on voir dire. That will take care of the hearing. And is there anybody that can't read a document that may be introduced into evidence, and that might take care of the other questions.

"MR. FLANNERY: Your Honor, I'm certain, and you preside over so many jury selections, every other one someone says, I can't hear, I can't hear.

"THE COURT: Well, I make an observation that everyone here does seem to [see] and everyone seems to hear. I feel very—I feel that if somebody cannot hear or see and they're selected, then in that event I will have to make arrangements to make sure that they, that we provide services for them to the best of our ability. People have a right to serve on juries who have poor eyesight and bad hearing, and other disablements.

"MR. GASTON: I understand, Your Honor—

"THE COURT: So the question is denied."

Both defendants appealed their convictions to the Court of Special Appeals, contending that the judges' refusal to ask the requested question concerning potential jurors' physical infirmities constituted reversible error. The defendants theorized that they *could* have been deprived of minimally qualified jurors, each with full physical faculties necessary to see and hear the evidence, as a result of the judges' refusal to ask the

question on *voir dire*. There was no evidence to suggest that any juror who was impaneled on either trial actually had any physical impairments whatsoever.

Our intermediate appellate court rejected the defendants' arguments and affirmed both convictions in separate unreported opinions. We granted defendants' petitions for certiorari to consider their contention that they have a *right*, upon request, to have the specific question on physical impairments posed to potential jurors on *voir dire*. We disagree.

## II

Our analysis of the instant cases requires a brief review of the evolution and requirements of the *voir dire* process in Maryland. Both the Sixth Amendment of the United States Constitution and Article XXI of the Maryland Declaration of Rights guarantee to criminal defendants the right to trial by an impartial jury. The process of *voir dire* of potential jurors has been developed to ensure juror impartiality:

> "Undergirding the *voir dire* procedure and, hence, informing the trial court's exercise of discretion regarding the conduct of the *voir dire*, is a single, primary, and overriding principle or purpose: 'to ascertain "the existence of cause for disqualification." '
>
> . . . . .
>
> "Thus, the purpose of the *voir dire* examination is to exclude from the venire those potential jurors for whom there exists cause for disqualification, so that the jury that remains is 'capable of deciding the matter before [it] based solely upon the facts presented, "uninfluenced by any extraneous considerations." ' "

*Hill v. State,* 339 Md. 275, 279, 661 A.2d 1164, 1166 (1995) (citations omitted). *See also Davis v. State,* 333 Md. 27, 633 A.2d 867 (1993); *Bedford v. State,* 317 Md. 659, 566 A.2d 111 (1989); *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627 (1958); *Adams v. State,* 200 Md. 133, 88 A.2d 556 (1952).

 The task of the trial judge is to impanel an impartial jury, and thus we have emphasized many times before that "the scope of *voir dire* and the form of the questions propounded rest firmly within the discretion of the trial judge." *Davis,* 333 Md. at 34, 633 A.2d at 870–71, *citing Casey,* 217 Md. at 605, 143 A.2d at 631 (1958); *Bedford,* 317 Md. at 670, 566 A.2d at 116–17; *McGee v. State,* 219 Md. 53, 58, 146 A.2d 194, 196 (1959); *Adams,* 200 Md. at 140, 88 A.2d at 559. Despite the broad discretion of the trial judge, however, we have defined a limited arena of *mandatory* questioning on *voir dire:*

> "[T]hus, the mandatory scope of *voir dire* in Maryland only extends to those areas of inquiry reasonably likely to reveal cause for disqualification. There are two areas of inquiry that may uncover cause for disqualification: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service, *see* Maryland Code (1974, 1989 Repl.Vol., 1992 Cum.Supp.), Courts & Judicial Proceedings Article, § 8–207; or (2) ' "an examination of a juror ... conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter *reasonably liable* to unduly influence him." ' "

*Davis,* 333 Md. at 35–36, 633 A.2d at 871 (emphasis in original) (citations omitted). In other words, we have held that the well-settled "right" to examine potential jurors, inherent in the constitutional right to a fair trial and an impartial jury, translates into a defendant's right to have certain questions propounded to the jurors where the proposed questions "concern a specific cause for disqualification." *Hill,* 339 Md. at 280, 661 A.2d at 1166.

In virtually all our previous cases, however, the proposed questions concerning specific cause for disqualification were related to the biases, such as racial or religious interests or prejudices, of the prospective jurors. As a result, in discussing what type of questions *must* be asked on *voir dire,* we have defined the proper focus of the *voir dire* examination to be only "the venireperson's state of mind and the existence of

bias, prejudice, or preconception, *i.e.*, 'a mental state that gives rise to cause for disqualification....' " *Hill*, 339 Md. at 280, 661 A.2d at 1167, *citing Davis*, 333 Md. at 37, 633 A.2d at 872. Although we did make a general statement in *Davis* that the minimum statutory qualifications for jurors would be included in the mandatory scope of *voir dire*, that case pertained solely to possible biases the venirepersons might have had in favor of law enforcement personnel, and our analysis and application of the rules of *voir dire* involved primarily the search for bias.

The *voir dire* question requested by the defendants in both *Boyd* and *Brooks* is unrelated to bias or a venireperson's state of mind; defendants maintain nonetheless that their proposed question concerns "a specific cause for disqualification," and therefore under the case law, particularly *Davis* and *Casey*, trial judges do not have the discretion to refuse to ask the question. The cases *sub judice* present us with the opportunity to apply our holdings in *Casey*, *Davis*, and other cases concerned with the *voir dire* process to a requested inquiry concerning the minimum physical qualifications of venirepersons.

## III

In *Casey*, the plaintiff sustained serious injuries when, while praying at her parish church, she slipped and fell on a waxed floor. She sued the Roman Catholic Archdiocese for negligence, and at trial requested a *voir dire* question regarding any particular bias a venireperson might have for or against the Roman Catholic Church or a member of the Church. The trial judge refused to ask the specific question and instead asked a general question on religious corporations. We held, in reversing the trial judge, that the general nature of the question was not sufficient to identify the specific bias the plaintiff sought to uncover and, indeed, given the facts of the case, was not specific enough to secure an impartial jury. *Casey*, 217 Md. at 607, 143 A.2d at 632. *Casey* stands for the proposition that, as to bias, a party has the "right" to have a bias question asked on *voir dire* only when the party has a

specific concern related to the facts of the case and when failure to ask the question might prevent the impaneling of an impartial jury.

*Casey* is only of limited help to our analysis in the instant cases and does not support the defendants' cause. As we have already noted, the petitioners were probing generally the minimum qualifications of their prospective panels rather than seeking to uncover bias, while *Casey* is only concerned with the search for impartial jurors. Nevertheless, we can examine our holding in *Casey* and extract certain relevant reasoning which can be applied in the instant cases.

For example, critical to our decision in *Casey* was the close connection between the plaintiff's requested question and the specific facts of the case, because a *specific* bias for or against the Roman Catholic Church was indeed possible, and an affirmative answer to the question would have exposed undue prejudice to the plaintiff's case and would have been cause for disqualification. The question proposed by the defendants in the instant cases, on the other hand, did not relate to the facts of their cases, nor did either defendant register on the record concerns about the physical limitations of any particular potential juror. Also, an affirmative answer to a question as to physical impairments, as we discuss further below, would not even have been automatic cause for disqualification.

Moreover, the inquiry requested in *Casey* was not one that was or could be made at any other point in the juror selection process; if one of the jurors did harbor a bias against the Catholic Church, *voir dire* was the one and only time to uncover it. As we discuss extensively in Part IV, statutory law in Maryland requires the exact inquiry requested by both Boyd and Brooks to be conducted at several earlier points in the juror selection process, rendering the requested questions unnecessary on *voir dire.*

*Davis* is also concerned with questions which might reveal bias rather than a failure to meet minimum statutory qualifications. Our holding in *Davis,* however, is important to our analysis in the instant cases. Davis, on trial for dealing drugs,

sought to have the judge ask prospective jurors if any of them were law enforcement personnel or related to law enforcement personnel on the theory that a member of the law enforcement establishment could be biased toward the prosecution. The trial judge refused to ask the question, and we affirmed his refusal. *Davis,* 333 Md. at 38, 633 A.2d at 873. We held that, unlike *Casey,* asking the question would not reveal any particular bias for or against the defendant, for a juror's profession or the profession of his relations would not be good evidence of his state of mind or prejudices. *Id.* at 37, 633 A.2d at 872. Moreover, we rejected Davis' argument that even if an affirmative answer to a question would not be grounds for immediate disqualification, it might combine with other observations the judge had made of the juror to persuade the court to excuse the individual for cause; we found that Maryland law did not support such "fishing." *Id.* at 38, 633 A.2d at 873.

█ In *Davis,* as we have already discussed in Part II of this opinion, we acknowledged that some *voir dire* inquiries would be mandatory upon request by one of the parties. We also clarified how to determine if a proposed inquiry is mandatory, noting two areas of inquiry which generally fall into the scope of mandatory *voir dire* questioning: minimum statutory qualifications and bias. *Davis,* 333 Md. at 35–36, 633 A.2d at 871, quoted *supra,* Part II. The key factor is not, however, simply whether the question falls into one of the two categories of questioning we mentioned in *Davis,* but most importantly whether such an inquiry, even within those two categories of questions, would be "reasonably likely to reveal cause for disqualification." *Id.* If the question is not reasonably likely to reveal cause, such as the question Davis proposed, it will not be an abuse of discretion for the judge to refuse to ask it; if the question would be reasonably likely to reveal something disqualifying, such as plaintiff Casey's proposed question regarding biases towards or against the Roman Catholic Church, the judge who refuses to ask the question will abuse his discretion and commit reversible error.

██ In the cases before us, a question on physical infirmities would not be reasonably likely to lead to cause for disqualification of a juror. First, as the exchange between Judge Ward and the attorneys points out, the identification of someone with a physical disability in no way automatically leads to the individual's disqualification. As the prosecutor noted, many persons may attempt to avoid jury service by claiming they cannot hear, but the judge cannot afford to excuse each juror based on such a claim, unverifiable as it is at that moment. Moreover, even if the judge believes a claim of physical impairment, he will likely attempt to accommodate the juror rather than excuse him.[1] While there may be merit in exploring what accommodations impaneled jurors need to evaluate evidence most effectively, *voir dire* is not the proper

---

1. The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (1990), which broadly proscribes discrimination against individuals with disabilities in the areas of employment, commerce, telecommunications and government, has been interpreted in other jurisdictions to apply to juror selection processes. *See Galloway v. Superior Court of the District of Columbia,* 816 F.Supp. 12 (D.D.C.1993) (policy of categorical exclusion of blind persons from Superior Court juries is a violation of the ADA); *New York v. Caldwell,* 159 Misc.2d 190, 603 N.Y.S.2d 713 (City Crim.Ct.1993) (juror's vision impairment did not render her automatically unqualified for jury service, and court had obligation pursuant to the ADA to provide reasonable accommodations to ensure the juror could follow the evidence); *United States v. Judiciary of the Sixth Judicial Circuit of Florida,* No. 204–7M–21 (DOJ, Nov. 1, 1993) (a Florida court's failure to provide a qualified interpreter for a deaf *defendant* led to a settlement agreement between the Department of Justice and the courts to establish a written policy on the provision of interpreters for *jurors* who have hearing impairments); *see generally Into the Jury Box: A Disability Accommodation Guide for State Courts,* American Bar Association Commission on Mental and Physical Disability Law and Commission on Legal Problems of the Elderly (Washington, D.C., 1994). Although we do not discuss the ADA in our analysis of the cases before us, nor do we make any holdings regarding its applicability, we surmise that if a juror did alert the judge to a serious physical infirmity at the *voir dire* stage, the judge would likely have to attempt to make reasonable accommodations for the juror to keep him or her on the panel. Only if reasonable accommodations could not be made, and the judge could verify that the juror absolutely did not have the physical capability to evaluate the evidence, would excuse for failure to meet statutory minimum qualifications be possible.

time to do so, and even if it were, it is not the question before us.

Second, and more importantly, as we have already noted, inquiries into potential jurors' physical ability to listen to and see evidence in a trial takes place, under Maryland law, long before *voir dire* examination of the venire. Additional specific questions of the same nature are redundant and unnecessary. We now examine the statutory juror selection and screening process.

## IV

Maryland courts screen juror qualifications on at least three levels: a statutorily-required juror qualification form, appearance before the jury judge or commissioner at the courthouse, and the trial judge's observance of each juror during the *voir dire.*

Maryland Code (1974, 1995 Repl.Vol.), § 8–201 *et seq.* of the Courts & Judicial Proceedings Article, is the statutory subtitle governing juror selection across the State. Before we review the selection procedures, we must examine the minimum qualifications for jury service covered in § 8–207:

"**§ 8–207. Qualifications for jury service.**

(a) *Determination.*—A person may not be disqualified or excused from jury service except on the basis of information provided by the juror qualification form as it may be supplemented by an interview or other competent evidence. The determination of a prospective juror's qualifications shall be made by the jury judge on his own initiative, or on the recommendation of the clerk or jury commissioner. The clerk shall enter the determination in the space provided on the juror qualification form and on the alphabetical list of names drawn from the master jury wheel. If a person did not appear in response to a summons, that fact shall be noted on the list.

(b) *Grounds for disqualifications.*—A person is qualified to serve as a juror unless he:

· · · · ·

(4) Is incapable, by reason of physical or mental infirmity, of rendering satisfactory jury service; any person claiming such a disqualification may be required to submit a doctor's certificate as to the nature of the infirmity...."

The subtitle further provides a broad but specific outline for juror selection. The statutes are flexible enough to accommodate the varying needs and resources of the different courts, while mandating the particular selection criteria which must be addressed in any juror selection procedure. § 8–201 requires that the circuit court of each county maintain a written plan for the random selection of jurors. No standardized plan is required, but § 8–202 provides for certain mandatory elements; these include a pre-summons juror qualification form which must, according to the statute, specifically ask the prospective juror about the grounds for disqualification listed in § 8–207. Pertinent to the cases before us is the requirement that any court's juror qualification form must inquire about physical infirmities which would prevent effective jury service:

"§ 8–202. Same—Mandatory provisions.

Among other things, the juror selection plan referred to in § 8–201 shall:

· · · · ·

(5)(i) Provide for a 'juror qualification form' which asks each potential juror:

· · · · ·

2. Whether the potential juror should be excused from jury service because the individual has any physical or mental infirmity impairing the individual's capacity to serve as a juror;...."

The meaning of the statutes governing minimal qualifications of jurors is not ambiguous. The identification of potential jurors who may have a physical infirmity impairing their

ability to be jurors, and the subsequent determination by the jury judge or jury commissioner that a potential juror is in fact "incapable" of rendering "satisfactory" jury service, shall occur before the potential juror appears for jury service through the information contained in the juror qualification form. The jury judge is also statutorily entitled to the opinion of a physician in making the determination that the physical infirmity is so severe that the individual cannot sit effectively as a juror. He is not required merely to accept the word of the potential juror.

The Circuit Court for Baltimore City has a jury selection plan, including a concise juror qualification form, which was made a part of the record in these cases. The form implements exactly the pre-appearance qualification screening required by the statutory scheme. A statement on the first page of the form states that the form is not a summons, but rather "a preliminary screening process to determine your qualifications for becoming a juror." It also informs the reader that "Maryland law requires that you complete and return this qualification questionnaire." On the second page of the form the potential juror finds a statement, "Under certain conditions you may be excused from jury duty." Question number five asks the juror if he or she wishes to be excused, and if the answer is yes, the juror must then check off the reason for the excuses and give additional details. One of the listed reasons for an excuse from jury duty is "Medical or Physical Reasons," and the form notes, "Excuses for medical or physical reasons must be accompanied by a doctor's letter." There can be no doubt that in the Circuit Court for Baltimore City, to borrow the words of the Court of Special Appeals in its unreported *Brooks* opinion, "[a] potential juror's physical and mental abilities . . . are part of the inquiry that is conducted *before* the individual becomes a member of the jury pool."

The defendants argue that the juror selection forms provide insufficient and outdated information to determine whether a juror is physically capable of seeing or hearing evidence in a case, because the time between the submission of the form and

the potential juror's actual appearance in court can be months or even years in some counties. The subtitle addresses this practical reality of jury selection, however, by creating a second level of screening. Section 8–206 specifically and explicitly authorizes the jury judge or commissioner to question the potential juror further on the information contained in the questionnaire upon the juror's appearance at the court:

"**§ 8–206. Completion of the juror qualification form; failure to return form; questioning jurors' qualifications.**

. . . . .

(c) *Judge may question juror about qualifications.*—When a person appears for jury service, or is interviewed by the jury judge, clerk, or jury commissioner, the person may be required to fill out another juror qualification form in the presence of the jury commissioner or the clerk of the court, and at that time, if it appears warranted, the person may be questioned, but only about his responses to questions contained on the form and grounds for his excuse or disqualification. The clerk or jury commissioner shall note any additional information thus acquired on the juror qualification form and transmit it to the jury judge."

As is evident in the portion of the *Brooks* transcript quoted in Part I of this opinion, the trial judges themselves have yet a third opportunity, through direct observation, to screen out a juror who is unqualified by reason of physical incapability. Judge Ward made a specific observation for the record that each juror "seemed" capable of hearing and seeing; common sense tells us that although such observations are not usually a part of the record unless counsel requests a question on physical infirmities, judges presiding over jury trials have every opportunity to (and likely do) take specific notice of the physical and mental capabilities of each juror and to excuse any juror whose physical impediments prevent him from evaluating the evidence.

Finally, in the instant cases there was a fourth level of screening for minimal qualifications inherent in the omnibus

questions asked at the end of each *voir dire*. In *Boyd,* Judge Ross asked two catchall questions:

> "THE COURT: Is there any member of the panel who knows of anything that would keep her or him from giving a fair and impartial verdict in this case?
>
> Is there any member of the panel that knows of any reason why he or she should not serve on the jury in this case?"

Judge Ward asked only a single omnibus question:

> "THE COURT: Now, the next question is, is there any reason whatsoever that you could not render a fair and impartial decision [based] solely on the law and evidence presented to you during the course of this trial? If there is such a reason, please stand."

In both trials, then, the jurors had another opportunity to identify themselves as unable to carry out their duties because of physical limitations. The questions, albeit not focused on the issue of a juror's health, provided the court with an adequate fourth level of screening.

## V

The plain words of the jury selection subtitle tell us that the purpose of juror qualification is to avoid discriminatory selection by screening out, in as objective a manner as possible, *only* those who absolutely cannot be effective jury members. Under the terms of § 8–207 of the Cts. and Jud.Proc.Article, every adult citizen is qualified to be a juror unless one of a very few narrow circumstances listed in the statute applies; moreover, § 8–206 of the same article delineates exactly the questions which can be asked of a potential juror upon his appearance for duty, preventing arbitrary disqualification by a jury commissioner. Our cases have also narrowly defined the purpose of *voir dire* and the type of questions which *must* be asked on *voir dire*.

From the words of the statute itself, from our case law on *voir dire* examination of the venire, and from the tenor of our recent jury selection decision, *Gilchrist v. State,* 340 Md. 606,

667 A.2d 876 (1995) (race may not be used as the basis for a peremptory challenge), it should be clear that current juror selection law and policy are concerned with the *removal* of unnecessary screening barriers. A mandatory questioning of prospective jurors about their physical limitations on *voir dire,* when the inquiry has been made thoroughly earlier in the selection process, and when an affirmative answer does not by any means denote likely disqualification, *imposes* an unnecessary screening barrier. Indeed, further questioning may embarrass or intrude upon the privacy of a prospective juror.[2]

The petitioners cannot specify a single reason why further questioning specifically on physical limitations is necessary. We acknowledge that a question on *voir dire* about physical limitations of jurors and addressed to all venirepersons might occasionally result in disqualification of a juror; but so might literally any other line of questioning. Defendants have not documented instances where the juror selection process failed completely to screen out physically incapable jurors, who would have been identified and excused had the question been asked on *voir dire.* In short, unless the judge has made some observations regarding possible physical problems, such questioning can become merely a general attempt to "fish" about for more information than is necessary about prospective jurors. Certainly it is not reasonably likely to lead to cause for disqualification.

A trial judge needs flexibility and control in the courtroom. We do not intend to circumscribe the discretion of the trial judge to select the questions asked on *voir dire* without a compelling reason; asking the question requested by the defendants at the *voir dire* stage is unnecessary and will not be mandated. The trial judges in both cases acted well within their discretion in refusing to ask the requested questions.

---

2. We noted in *Davis* that permissible but potentially embarrassing or humiliating questions posed on *voir dire* should be structured in such a way to avoid unnecessarily embarrassing the venire panel. *Davis,* 333 Md. at 36, 633 A.2d at 871, n. 1.

■ By holding that a requested question on *voir dire* about the physical impairments of the jurors is not mandatory, we are not directly or implicitly holding that such a question is prohibited. Rather, our task here, as in many cases, has been simply to determine whether there has been an abuse of discretion in failing to ask the requested question; that we have found no abuse of discretion should not be interpreted to mean the question *must* not be asked under any circumstances.

We also do not hold, contrary to the Court of Special Appeals' opinions in these cases, that the *exclusive* purpose of *voir dire* is to ferret out bias. We acknowledge identification of bias to be the primary purpose of *voir dire,* as the minimum qualifications of jurors are supposed to be examined at an earlier stage; nonetheless, certainly *voir dire can* serve as one final check of the physical qualifications of prospective jurors, particularly if the judge observes something amiss. The point here, though, is that such questions on *voir dire* are not *mandatory* and the requesting party has no such *right* to have them asked.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.*