906 A.2d 374

STATE of Maryland

v.

James Ramiah LOGAN.

No. 100, Sept. Term, 2005.

Court of Appeals of Maryland.

Sept. 1, 2006.

Glenn F. Ivery, Special Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Edward J. Kelley, Asst. Atty. Gen., on brief), for petitioner/cross-respondent.

Gary E. Bair (Fred Warren Bennett, Bennett & Bair, LLP, Greenbelt, on brief), for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

We granted review to consider two issues in this case. We granted the State's petition for certiorari to consider whether the trial court acted within its discretion in refusing to pose Logan's multi-part voir dire questions regarding the defense of not criminally responsible (NCR) and the potential effect of pretrial publicity. We granted Logan's cross-petition to consider whether the trial court's error in admitting into evidence his confession in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was harmless error.

I.

James Ramiah Logan was indicted by the Grand Jury for Prince George's County for two counts of first-degree premeditated murder and two counts of use of a handgun during the commission of a crime of violence. He entered a plea of not guilty and not criminally responsible. The jury found him guilty of two counts of second-degree murder and two counts of the handgun offense. He was also found criminally responsible. The Circuit Court sentenced Logan to a total term of incarceration of one hundred years.

On or around August 25, 2003, Logan began behaving in a manner that alarmed his family. He went to Prince George's County Hospital for an evaluation and while there, admitted to past use of PCP. His blood tested positive for cocaine. Lo-

gan's family requested that Logan admit himself voluntarily to a hospital, but Logan refused to do so. On August 29, 2003, Logan's wife and his mother obtained a court order directing the Prince George's County Sheriff's Office to transport Logan for the purpose of conducting an emergency psychiatric evaluation. That day, Logan smoked several "bowls" of marijuana and then went to his parents' house with two friends to conduct a bible study. On the evening of August 29, 2003, Deputies James Arnaud and Elizabeth Magruder went to Logan's parents' home to enforce the emergency order for psychiatric evaluation. The deputies went to the basement where Logan was participating in the bible study. Logan fled upstairs and the deputies pursued him. As they were standing outside of his bedroom door, Logan shot and killed both of them.

Logan was arrested by the Prince George's County Police for the murder of the two deputies. He was transported to police headquarters, where he was interviewed by Prince George's County homicide Detective Vincent Canales for approximately three and one half hours. Prior to reading Logan his *Miranda* rights, the detective assured Logan repeatedly that he was not going to harm him, that they were "just talking," and that he would not allow any harm to come to Logan's parents about whom Logan had expressed concern. During the discussion of *Miranda* rights, Detective Canales assured Logan that his role was not to hurt him, and that he would be "one hundred percent" truthful with Logan, if Logan would be the "same way." Immediately before Logan said he would waive his *Miranda* rights, the detective told Logan that the only way he would be "jeopardized" was if he did not tell the truth. Logan said he would waive his rights, and then admitted shooting Deputies Arnaud and Magruder. Logan explained to the detective that he had intended to kill the deputies, stating as follows:

"DET. CANALES: Okay, so when you shot them, I mean, it was with the intention of hurting them, was the intention basically getting rid of them altogether?

LOGAN: It was intentional on, yeah, to put them down, boom, just you know what I'm saying.

DET. CANALES: When you say put them down, I mean, you come and—

LOGAN: I came out intending to do it.

DET. CANALES: Intended to kill them.

LOGAN: Yeah.

\* \* \*

DET. CANALES: You knew you were going to shoot them once you came out?

LOGAN: (shakes head.)

DET. CANALES: And you came out and you killed them, right?

LOGAN: Um-hum."

Logan filed a motion to suppress his confession to Detective Canales on the ground that the police violated *Miranda.* The Circuit Court denied the motion. Logan entered a plea of not guilty and not criminally responsible. The State filed a notice of its intent to seek the death penalty.[1] At trial, Logan requested that the judge ask specific questions on voir dire to the venire regarding the NCR defense and pretrial publicity surrounding the case, which the trial judge refused to do.

At trial, Logan's counsel conceded that Logan shot Deputies Arnaud and Magruder, but claimed that Logan was not criminally responsible for his actions. He presented expert testimony that Logan was suffering from paranoid schizophrenia at the time of the shootings, which prevented him from appreciating the criminality of his conduct or conforming his conduct to the requirements of the law. In response, the State presented expert testimony that Logan's behavior was caused by his voluntary ingestion of drugs. The jury found Logan guilty of two counts of second degree murder and found him criminally responsible for the murders.

---

1. Because the jury returned verdicts of second degree murder, Logan was not eligible for the death penalty.

Logan noted a timely appeal to the Court of Special Appeals. In a reported opinion, the Court of Special Appeals reversed. *Logan v. State,* 164 Md.App. 1, 882 A.2d 330 (2005). The court held that the admission of Logan's confession was in violation of *Miranda,* but that the error was harmless beyond a reasonable doubt. *Id.* at 52, 882 A.2d at 359. With respect to the voir dire issues, the court concluded that the trial court abused its discretion by failing to probe for bias regarding the NCR defense, even if Logan's proposed questions were improper. In addition, the court held that the question on pretrial publicity posed by the trial judge to the venire was contrary to *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), because that query sought only to uncover the jurors' own bottom-line conclusions as to their impartiality. The intermediate appellate court concluded that the trial court should have inquired whether jurors exposed to pretrial publicity had formed an opinion regarding the case due to such exposure. *Logan,* 164 Md.App. at 72–73, 882 A.2d at 369–71.

We granted the State's petition for certiorari to decide the following question:

"Did the Court of Special Appeals err when it vacated Logan's convictions on the basis that the trial court failed to formulate and pose additional questions to the venire panel regarding the defense of not criminally responsible and the issue of pretrial publicity?"

*State v. Logan,* 390 Md. 284, 888 A.2d 341 (2005).

In addition, we granted Logan's conditional cross-petition for certiorari to decide the following question:

"Did the Court of Special Appeals err in ruling that the admission of Respondent's confession obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, was harmless beyond a reasonable doubt?"

*Id.*

## II.

We address the harmless error issue first. In his cross-petition, Logan argues that the Court of Special Appeals

erred in ruling that the admission of his confession obtained in violation of *Miranda* was harmless error. In Maryland, error is harmless if "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

The intermediate appellate court found the error to be harmless. As to the guilt/innocence determination, the court held that, because at trial petitioner conceded criminal agency, the admission of his confession was not prejudicial with respect to the identity of the murderer. *Logan*, 164 Md.App. at 50, 882 A.2d at 358. As to the impact on the NCR defense, the court held that because the defense relied heavily on Logan's statements to Detective Canales to support the NCR defense, there was no prejudice. *See id.* at 50–52, 882 A.2d at 358–59.

Logan argues that the admission of his confession was not harmless error because the State used the confession in two ways to bolster its claim that Logan was criminally responsible: first, that the State's experts considered the confession in forming their opinion that Logan was criminally responsible, and second, that the prosecutor used the confession repeatedly in closing argument to show that he was responsible. As to the defense's use of the confession, Logan responds that once the confession had been admitted into evidence, he had no choice but to make the best of a bad situation and try to rebut or explain the evidence.

Before this Court, the State does not dispute the holding of the Court of Special Appeals that the trial court erred in finding a waiver of *Miranda*. The State argues that the jury verdict rejecting the NCR defense was not impacted by the introduction of petitioner's confession.

We hold that the error was not harmless. The confession undisputedly was taken by the police in violation of *Miranda* and was admitted improperly into evidence. Experts for both parties testified that they considered the videotape confession

in arriving at their opinion regarding Logan's criminal responsibility. In closing argument, the State urged the jury to reject the NCR defense, pointed to the videotape of the confession, and argued as follows:

"You see in his statement time and time again he says I made the decision to do this. That tape does not in any way show the person to be schizophrenic. First of all psychotic does not equal schizophrenia. We will get to that in a little bit. That tape shows clearly the person can answer questions, knows what is going on. He has a different thought process, he has his Biblical references."

In its rebuttal closing argument, the State again alluded to petitioner's statements, urging the jury to consider all of the evidence—"after they listen to the experts, after they listen to all of the evidence." The State referred to the detective's interview with Logan, and read a part of the interview to the jury in which Logan admitted that he had formed the intent to kill the deputies. The State then noted as follows:

"The words and actions of the defendant, Mr. Logan, tell us everything we need to know about his intent and his premeditation for purposes of first degree murder under Maryland law. 'I wanted to annihilate them, I couldn't leave them alive.' "

The State urged the jury to look at and to consider the videotaped confession in determining the validity of the NCR defense. In addition, the State's experts considered the videotaped confession in forming their opinions as to petitioner's responsibility at the time of the crimes.

The State introduced the entire taped interview of petitioner conducted by Detective Canales. On the tape, Mr. Logan stated repeatedly that he knew what he was doing and that he intended to kill the sheriffs; the jury heard and saw him admit that on the videotape. After hearing such information from the defendant, it would be difficult for the jury not to use the confession in arriving at its verdict. We cannot say that the error in no way influenced the verdict. *See Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 1258, 113

L.Ed.2d 302 (1991) (observing that "a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision").

 The fact that the defense used the confession does not change our view. The State is arguing that because petitioner used parts of the videotaped confession to support his NCR defense, he either waived the error, or alternatively, that the defense would have introduced the evidence on its own and therefore, the error was harmless. We do not agree. The defendant does not waive an error by attempting to minimize or explain improperly admitted evidence. 1 WIG-MORE, EVIDENCE § 18, at 836–38 (Tillers rev.1983) (noting that "an opponent ordinarily waives his own objection if he makes subsequent use of evidence similar to that which he had previously objected, except where such subsequent use was done merely in self-defense, to explain or rebut the original evidence"). It would be unfair to permit the State to introduce evidence, *albeit* later found to be inadmissible, but not to permit the defendant, upon pain of waiver, to attempt to meet it, explain it, rebut it or deny it. *See Rogers v. State,* 853 S.W.2d 29, 35 (Tex.Crim.App.1993) (stating that while ordinarily the general rule is that a defendant waives an error regarding improperly admitted evidence if the defendant or the State later introduces the same evidence without objection, the error is not waived "when the evidence is brought in later in an effort to meet, rebut, destroy, deny, or explain the improperly admitted evidence"). Here, petitioner did not introduce the confession, but merely attempted to meet it. The confession showed both Logan's state of mind and demeanor shortly after the murders, and thus, was powerful evidence against him. *See Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1257–58.

Under the circumstances, the State cannot show that prejudice against Logan did not result from the improper admission of his confession at trial. *See Collins v. State,* 318 Md. 269, 286–87, 568 A.2d 1, 9 (1990); McLain, Maryland Evidence,

§ 103:22(c), at 99–100. We cannot conclude that there is no reasonable possibility that the erroneously admitted confession did not contribute to the jury's rendition of a guilty verdict. *Dorsey,* 276 Md. at 659, 350 A.2d at 678; *see also Fulminante,* 499 U.S. at 313–14, 111 S.Ct. at 1266–67 (Kennedy, J., concurring) (discussing the significant impact that the admission of a full confession may have upon the trier of fact as distinguished from the impact of an isolated statement that is incriminating only when connected to other evidence). Accordingly, we hold that the admission of Logan's confession into evidence, in violation of *Miranda,* was not harmless error beyond a reasonable doubt.

### III.

Although the voir dire issue has become moot in light of our disposition regarding harmless error, we address the issue for guidance because on retrial it is likely to arise again. During voir dire, the trial court propounded questions to three separate venire panels. Logan proposed a number of questions for the trial court to ask prospective jurors during voir dire, including the following multi-part question regarding an NCR defense:

"7. Evidence will be produced during trial showing that the Defendant suffered from paranoid schizophrenia at the time of the crime. To that end, the defense will argue that the defendant was not criminally responsible at the time of the crime because, due to this mental disorder, he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

a. If the defendant satisfies his burden in this regard, will any member of the jury be unable to find the defendant not criminally responsible?

b. Does any juror anticipate having difficulty following the Court's instructions on the defense of 'not criminally responsible,' particularly in view of the crimes charged in the indictment?

c. Has any member of the jury studied psychology or psychiatry?

d. Do you have any reservations or feelings that would prevent you from fairly considering the evidence in the case?

e. In view of the defense of 'not criminally responsible,' does any member of the venire prefer not to sit on the case?"

The trial court did not ask Logan's Question 7, as proposed, but asked each jury panel whether any member of the venire or members of their families had any experience, training, or education in a mental health field, such as psychology or psychiatry. Each juror who responded affirmatively was asked follow-up questions at the bench.

Logan also requested that the trial court ask the following question to uncover bias from any pretrial publicity to which venirepersons were exposed:

"4. The allegation in this case is that on August 29, 2002, two employees from the Prince George's County Sheriff's Department, Elizabeth Magruder and James Arnaud went to the home of Mr. Logan's parents to serve him with an Order for an Emergency Psychiatric Commitment. It is further alleged that in the process of serving the Order for an Emergency Psychiatric Commitment, the two Sheriffs were shot and killed by the defendant.

With regard to the following questions, please listen to the questions, and if you have an affirmative answer to one or more of these questions, please then stand and we will deal with each of you individually.

INDIVIDUAL VOIR DIRE AT BENCH

a. Have any of you read, heard, or seen on TV, anything about the case?

b. From where did you obtain your knowledge of the facts?

c. What did you hear?

d. As a result of what you heard about the case, have you formed any opinion as to the guilt or innocence of Mr. Logan or whether he was 'not criminally responsible' at the time of the alleged crimes?

e. What is your opinion?

f. In light of your pre-formed opinion do you believe you still could be fair and impartial and render a verdict based solely on the evidence?"

The trial court did not ask Logan's Question 4 as proposed, but did ask whether anyone had personal knowledge of the case or knowledge gained from other individuals or news media about the facts of the case. With respect to the court's questioning regarding prior knowledge, a total of thirty-eight prospective jurors responded affirmatively that they had prior knowledge of the case. When a prospective juror indicated prior knowledge of the case, the judge asked him or her for the source of the information and whether knowledge of the information would prohibit the juror from serving fairly and impartially. If the juror responded that he or she could not serve fairly and impartially, the judge excused the prospective juror. Logan objected on several occasions to the manner in which the trial judge was questioning the prospective jurors about their prior knowledge of the case.

As to the NCR defense, the Court of Special Appeals held that because the venire's views towards the NCR defense were crucial to the determination of whether there was cause for disqualification, the trial court should have inquired whether any prospective jurors had reservations or strong feelings regarding such a defense. *See Logan,* 164 Md.App. at 66, 882 A.2d at 367. The intermediate appellate court concluded that the trial court either erred or abused its discretion in failing to propound questions concerning juror attitudes and potential bias about an NCR defense, even though Logan's questions on that topic were framed improperly. *See id.* at 61, 65, 69, 882 A.2d at 364, 367, 369. As to the pretrial publicity issue, the Court of Special Appeals held that even though the trial court was not required to ask content-based questions, the trial

court erred in not asking some variation of Logan's proposed Question 4d, which asked jurors who had been exposed to pretrial publicity whether they had formed an opinion about the case based on such exposure. *Id.* at 72–73, 882 A.2d at 370–71. The intermediate appellate court reasoned that the trial court's procedure in inquiring merely whether the jurors believed they could serve fairly and impartially "shifted to the venire its 'responsibility to decide juror bias.'" *Id.* at 72, 882 A.2d at 371 (quoting *Dingle,* 361 Md. at 21, 759 A.2d at 830).

The State presents several arguments to support its position that the trial court did not abuse its discretion when it refused to ask the jury venire panel Logan's questions related to his NCR defense. The State maintains that the trial court need not ask voir dire questions related to the NCR defense because a defense, unlike a criminal charge, might not be generated at trial. Therefore, the State reasons, voir dire questions related to a defense differ markedly from questions related to the crime itself where the nature of the charges might arouse strong feelings, such as a narcotics possession charge or sexual assault against a minor. Alternatively, if probing as to views on the NCR defense are required, the State argues that the voir dire questions posed by the trial court were sufficient to ascertain whether any prospective juror had any disqualifying bias toward NCR defenses. Finally, the State argues that Logan's proposed five-part question as to the NCR defense was improper, that the trial court was not required to reformulate the voir dire questions and that the trial court did not deny him the opportunity to propose additional questions that might have been proper.

The State's position as to pretrial publicity and voir dire is that the Court of Special Appeals erred in concluding that the trial judge was required to ask specific questions as to whether prospective jurors had formed an opinion of the case based on pretrial exposure. The State reasons that the decision to make such an inquiry is committed to the discretion of the trial court. With respect to the catch-all question, asking prospective jurors whether they had any additional reason which would make them unable to render a fair and impartial

verdict solely on the evidence, the State argues that through this question, biases based on exposure to pretrial publicity would have been detected. Finally, the State contends that the voir dire conducted in this case concerning pretrial publicity did not run afoul of *Dingle;* the trial court exercised its discretion to make an inquiry into pretrial publicity, and then determined independently whether each juror to whom it individually posed follow-up questions could serve impartially.

Logan argues that the Court of Special of Appeals concluded correctly that the trial court should have posed additional voir dire questions to the venirepersons concerning the NCR defense and pretrial publicity. He maintains that a prospective juror's view regarding an NCR defense is likely to evoke strong feelings that may hinder a juror's ability to serve fairly and impartially. Moreover, if the trial judge believed that the proposed questions were improperly phrased, he should have asked counsel to reformulate the question or done so on his own.

As to pretrial publicity and voir dire, Logan argues that this Court's precedents addressing the scope of voir dire in Maryland required the trial judge to conduct a more thorough questioning of venirepersons in order to ferret out bias. Such an inquiry would include questions about the nature of what the prospective juror heard, whether the juror had formed an opinion about the case based on that information, and if so, what the juror's actual opinion was regarding the case. With respect to the questions on pretrial publicity actually posed by the trial judge, Logan argues that they were inadequate in light of *Dingle,* because they sought little more than the prospective jurors' bottom-line conclusions about whether the jurors could be fair and impartial.

## IV.

■■ Voir dire is critical to the protection of a criminal defendant's right to a fair and impartial jury, as guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. *Curtin*

v. *State*, 393 Md. 593, 903 A.2d 922 (2006); *White v. State*, 374 Md. 232, 240, 821 A.2d 459, 463 (2003); *State v. Thomas*, 369 Md. 202, 206, 798 A.2d 566, 568 (2002). In Maryland, the primary purpose of voir dire is to ensure a fair and impartial jury by determining the existence of cause for disqualification. *Thomas*, 369 Md. at 207, 798 A.2d at 569.

We have identified two broad areas of inquiry that may reveal cause for disqualification: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service; or (2) an examination to discover the juror's state of mind as to "the matter in hand or any collateral matter reasonably liable to unduly influence him." *Davis v. State*, 333 Md. 27, 35–36, 633 A.2d 867, 871 (1993). The scope of voir dire and the form of questions propounded rest firmly within the discretion of the trial judge. *Curtin*, 393 Md. 593, 903 A.2d 922; *Boyd v. State*, 341 Md. 431, 436, 671 A.2d 33, 35 (1996) (quoting *Davis*, 333 Md. at 34, 633 A.2d at 870–71). Accordingly, it is the responsibility of the trial judge to conduct an adequate voir dire to eliminate prospective jurors from the venire who will be unable to perform their duty fairly and impartially. *White*, 374 Md. at 240, 821 A.2d at 463. To that end, the trial judge should focus questions upon "issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered." *Thomas*, 369 Md. at 207–08, 798 A.2d at 569. On appellate review, because the trial judge has had the opportunity to hear and observe the prospective jurors, we pay substantial deference to the judge's conclusions, unless they are the product of a "voir dire that is cursory, rushed, and unduly limited." *Id.* at 241, 798 A.2d 566, 821 A.2d at 464. We review the trial judge's rulings on the record of the voir dire process as a whole to determine whether the trial judge abused his or her discretion. *White*, 374 Md. at 243, 821 A.2d at 466.

A. Voir Dire and Defense of Not Criminally Responsible

We reiterate that which we have stated repeatedly: the trial court has very wide discretion in conducting voir

dire, and the court's rulings will not be disturbed on appeal unless it constitutes an abuse of discretion. *See, e.g., Landon v. Zorn,* 389 Md. 206, 216, 884 A.2d 142, 147–48 (2005); *White,* 374 Md. at 241, 821 A.2d at 464; *Dingle,* 361 Md. at 13, 759 A.2d at 826. Defenses, including the NCR defense, do not fall within the category of mandatory inquiry on voir dire.[2] Prior to questioning each panel of venirepersons, the trial court provided a brief factual summary of the case, and explained that as a result of the deaths of the deputy sheriffs, the defendant was charged with murder and handgun charges, and entered pleas of not guilty and not criminally responsible. The trial court asked the venire if any member thereof or their immediate family members had any experience, training or education in the mental health field, such as psychiatry or psychology, and also inquired on a pretrial questionnaire sent to all prospective jurors, in Question 15, "[i]f psychiatric or psychological evidence was presented at sentencing, would you be able to fairly weigh this evidence along with all other evidence presented?" The trial judge also asked the venire whether they had any religious, moral, philosophical, or any other personal reasons that made it difficult to sit in judgment of another person. Finally, the trial judge asked the venire

---

**2.** This Court has identified areas of mandatory inquiry for the trial judge to address on voir dire. *See Hernandez v. State,* 357 Md. 204, 232, 742 A.2d 952, 967 (1999) (racial, ethnic, and cultural bias); *Langley v. State,* 281 Md. 337, 349, 378 A.2d 1338, 1340 (1977) (placement of undue weight on police officer credibility); *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 606–07, 143 A.2d 627, 632 (1958) (religious bias). In a possession of narcotics case, we have held that a trial court abused its discretion by failing to voir dire a jury panel for "strong feelings regarding violations of the narcotics laws." *Thomas,* 369 Md. at 204, 798 A.2d at 567. We similarly determined that a trial court abused its discretion when it refused to question venirepersons in a sexual offense case as to whether "the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial in [that] case?" *Sweet v. State,* 371 Md. 1, 9, 806 A.2d 265, 270–71 (2002). Thus, where the proposed voir dire question is directed at biases, relating specifically to a defendant's alleged criminal act, they would, if revealed, "be disqualifying when they impaired the ability of the juror to be fair and impartial." *See id.* at 10, 806 A.2d at 271. In such instances, the trial judge abuses his or her discretion by not asking requisite questions to the venire. *Id.*

whether there was any other reason not otherwise addressed by the trial judge that prevented them from rendering a fair and impartial verdict. Reviewing the voir dire as a whole, we conclude that the trial court acted within its discretion in asking these questions and declining to ask Logan's proposed questions to determine any juror bias or prejudice.[3] *See White*, 374 Md. at 243–44, 821 A.2d at 465 (concluding that a trial court has acted within its proper discretion when, "the voir dire process is viewed as a whole, it is clear that the trial court conducted extensive voir dire examinations of prospective jurors").

Each part of Logan's proposed multi-part question regarding the NCR defense, with the exception of Question 7c, which was covered by the trial judge, was improperly phrased, and thus, it was not an abuse of discretion for the trial judge to refuse to ask Logan's proposed questions to the venire. Question 7a on the NCR defense, stated: "[i]f the defendant satisfies his burden in this regard, will any member of the jury be unable to find the defendant not criminally responsible?" The Court of Special Appeals reasoned that Question 7a was not a proper voir dire question because it asked prospective jurors whether they would apply the rules of law as instructed by the trial court. *Logan v. State*, 164 Md.App. at 65, 882 A.2d at 367. We agree that Question 7a amounts to a

---

3. Logan maintains that even if his proposed question was not framed properly, Maryland law required the trial judge to ask defense counsel to reformulate the question, or to rephrase the questions on its own initiative. The Court of Special Appeals reasoned as follows:

"Even if appellant's questions were not well framed, however, it is clear that he sought to discover cause for disqualification based on bias towards an insanity defense. On that basis, if the court below was not satisfied with the form, it could have reformulated the questions or allowed defense counsel to do so."

*Logan*, 164 Md.App. at 61, 882 A.2d at 364. The State contends that, assuming that the NCR defense was an appropriate topic for voir dire, it was Logan's obligation to present a properly formed question on the topic which was designed to reveal juror bias.

Because the court was not required to ask questions specifically directed to the NCR defense, there was no obligation on the court to reframe Logan's improperly phrased questions.

solicitation of whether prospective jurors would follow the court's instructions on the law. This practice is generally disfavored in Maryland, and we find no abuse of discretion on this point. *See Twining v. State,* 234 Md. 97, 100, 198 A.2d 291, 293 (1964) (stating it is "generally recognized that it is inappropriate . . . to question the jury as to whether or not they would be disposed to follow or apply stated rules of law").

In addition, Question 7a was vague, and thus the trial judge did not abuse his discretion in refusing to propound it to the venire. *See Grogg v. State,* 231 Md. 530, 532, 191 A.2d 435, 436 (1963) (concluding that the trial court did not abuse its discretion when refusing to ask a question that it held too broad, because it was a "vague, blunderbuss-type question, the answer to which would have been of little aid in appellant's determining whether a particular juror had any predisposition concerning either the science of psychiatry or the defense of insanity"). The question uses the phrase "burden in this regard," although not stating but obviously referring to the burden of preponderance of the evidence that Logan would have to satisfy in order to be found not criminally responsible. The question, however, neither identifies specifically, nor explains Logan's burden with respect to an NCR defense. Because prospective jurors were asked to conclude whether they could return a verdict of NCR without an explanation of the defense or the burden of persuasion, the question would have been of little assistance in uncovering potential juror bias.

Logan's proposed Question 7b read "[d]oes any juror anticipate having difficulty following the Court's instructions on the defense of 'not criminally responsible,' particularly in view of the crimes charged in the indictment?" The question suffers from the same flaw as Question 7a: whether jurors, without knowing what the court's instructions on the law would be, were asked if they would have difficulty following them. Not unlike Question 7a, Question 7b is too vague to be of any assistance to Logan, and thus the trial judge did not abuse his discretion in refusing to propound Question 7b to the venire. *See Grogg,* 231 Md. 530, 191 A.2d 435. As we made

clear in *Twining,* 234 Md. at 100, 198 A.2d at 293, voir dire is not the appropriate time for the trial judge to instruct the jury on the law applicable to the case.

Proposed Question 7c read "[h]as any member of the jury studied psychology or psychiatry?" The trial court asked this question. We find no error.

■■ Question 7d read "[d]o you have any reservation or feelings that would prevent you from fairly considering the evidence in the case?" The court asked the prospective jurors several questions similar to this requested question. The court asked "[w]ould any member of this panel for any religious, moral, philosophical or personal reasons be unable . . . to sit in judgment of another person and to fairly serve as a juror?" The court concluded the general voir dire with the following question: "[f]inally, do any of you have any reason that I haven't gone into specifically why you believe that you could not sit as a juror in this case and render a fair and impartial verdict based solely on the evidence?" In the written questionnaire, the court asked "[is] there anything else that would interfere with your ability to sit as an impartial juror in this case, fairly and objectively considering all of the evidence, and ultimately rendering a fair and impartial verdict based solely on the evidence presented in the courtroom and the court's instructions on the law?" Question 7d was fairly covered during the voir dire.

■■■ Question 7e read "[i]n view of the defense of 'not criminally responsible,' does any member of the venire prefer not to sit on the case?" This question is simply an improper question and the trial court is not required to ask it. The issue is not whether a juror *prefers* not to sit on a case; the issue is whether the juror is biased. It is a citizen's civic duty, if selected, to serve as a juror. The court did not abuse its discretion in refusing to ask this question.

### B. Voir Dire and Pretrial Publicity

■■ Logan argues that the form of the trial court's questions as to pretrial publicity was inadequate in light of this

Court's opinion in *Dingle,* 361 Md. 1, 759 A.2d 819, and seeks reversal. We disagree.

Logan primarily argues that because the court did not inquire about the nature of what the potential juror heard, whether the juror had formed an opinion about the case as a result of that information, or what the opinion was of that juror, that the court permitted the juror to "self-assess" his or her impartiality in violation of *Dingle.* The trial court did not ask compound questions but rather asked broad, single issue questions, and if a juror responded, the juror was invited to the bench for follow-up questions.

Contrary to Logan's suggestion, a trial court is not required to ask content-based questions. As the U.S. Supreme Court explained in *Mu'Min v. Virginia,* 500 U.S. 415, 425–36, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991):

"Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of questioning: is this juror to be believed when he says he has not formed an opinion about the case? Questions about the content of publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."

We agree. The trial court in this case made the required decision at the end of the individual voir dire conducted at the bench in light of all of the questioning: can this juror be believed when the juror said he or she could be fair or impartial? We find no error.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.***

Chief Judge BELL joins in the judgment only.